OPINION OF THE COURT
Norman C. Ryp, J.
A. ISSUE
May a co-operative sponsor legally bar a profitable “flip-over” by tenant subscribers at the inside(r’s) price executed prior to but effective after title closing? An issue of very first impression.
B. PROCEDURAL HISTORY
Plaintiffs, University Mews Associates and University Mews Owners, Inc., respective owner “Sponsor” and *435 “Apartment Corporation” of a co-operative offering plan at premises No. 39 (1-45) East 12th Street, New York, New York, 10003 (subject premises or University Mews) move:
(a) for leave to serve and file a supplemental summons and amended complaint, under CPLR 3025, to add as parties defendants, nunc pro tunc, additional tenants who entered into subscription agreements for purchase of their apartments at the “inside(r’s)” price (i.e., allocated shares of the Apartment’s Corporation “purchase”), and have allegedly offered or contracted for resale thereof prior to title closing at the market or “outside(r’s) price” (hereinafter “flip-over”); and
(b) enjoin, pendente lite, all current and additional defendants, each a “flip-over” tenant, from selling their respective Apartment Corporation shares or directing that all “flip-over” proceeds above the “inside(r’s) price” be held in escrow.
The underlying complaint (consisting of 48 causes of action, to which plaintiff seeks to add by amendment) seeks parallel, permanent injunctive relief, and impressment of a trust of all “flip-over” profits for the benefit of plaintiffs. In response, defendants interposed various general and specific denials, affirmative defenses (estoppel, waiver and fraud), and counterclaims for compensatory and punitive damages (breach of contract, fraud and misrepresentation) .
Defendant Sothern cross-moves for summary judgment under CPLR 3212 there being joinder of issue herein, dismissing the complaint, with costs, for legal insufficiency.
c. parties’ contention
Plaintiffs, in support of their parent motion, contend defendants violated paragraphs 7A, 10 and 12 of the subscription agreement by alleged assignments of their insider’s) price, tenants’ rights, or “flip-overs” at enormous or substantial profit prior to title closing. Plaintiff annexes: photocopies of a June 14, 1981 New York Times ad “Tenants Right Bought”; contract of loan and future sale; May, 1981 realty brokers’ (Whitbread-Nolan, Inc.) listings of various defendants; various June, 1981 New York Times *436 ads for alleged sale of various defendants’ apartments to which plaintiffs’ principal (Harvey P. Katz) responded under various aliases; photocopies of three contracts of sale.
In opposition, defendants contend, individually and collectively, that if they consulted or utilized a real estate broker or agent, it was for the purpose of ascertaining the current market value of their apartments; there was absolutely no violation of the subscription agreement; once an apartment is purchased by such tenant, the new (former tenant) owner has an absolute right to alienate his, her or their apartment by contract of sale utilizing outside financing subject only to terms, covenants and conditions set forth in the proprietary lease as implemented by the cooperative board of directors; any profit is the rightful property of the seller (former tenants); plaintiffs lack good faith and “clean hands” by use of fictitious names and impersonations of a prospective purchaser; estoppel and waiver by knowingly closing title with “flip-over” defendants; thus, plaintiffs have failed to sustained their burden of proof for obtaining a preliminary injunction or complied with any of the CPLR 6201 prerequisite grounds for an attachment of funds.
D. FACTS
The general facts, substantially uncontroverted, are as follows:
Subject premises, University Mews, is a rent-stabilized building on East 12th Street, between Broadway and University Place, containing 94 apartments, including 16 apartments and their tenants involved in the subject action. On or about August 5,1980, the owner-sponsor filed a co-operative offering plan (Offering Plan) which was accepted by the New York State Attorney-General. The Offering Plan gave tenants in occupancy the right to purchase their respective apartments at $550 per share (“inside[r’s] price”), while nonoccupants could purchase available apartments at $676 per share (“outside[r’s] price”). The Offering Plan was a so-called “eviction” plan, requiring approval by 35% of the tenants then in occupancy under subdivision 4 of section 61 of the Code of the *437 Rent Stabilization Association of New York City, Inc. (RSC), and the Rent Stabilization Law of 1969 (RSL; Administrative Code of City of New York, § YY51-1.0 et seq.).
The Offering Plan, accepted for filing by the New York State Attorney-General on August 5, 1980, included a subscription agreement, whose pertinent paragraphs, 7A, 10 and 12, provide as follows:
“7.A. * * * This subscription Agreement is not assignable by me without the prior written consent of the Apartment Corporation * * * Any attempted assignment without such consent shall be null and void * * *
“10.1 represent that I am * * * purchasing the shares for my own account and not for the account of any other individual, corporation, partnership, trust or other entity * * *
“12. * * * The purchase is for my personal occupancy (Emphasis added.)
The Offering Plan, in its summary of the provisions of the proprietary lease, relating to the assignment of the proprietary lease or sublet of any apartment provided as follows:
“Assignment and Subleases
“A Tenant-Shareholder may sell his shares and assign his Proprietary Lease, or sublet his Apartment at any time, in compliance with the provisions of the Proprietary Lease and the By-Laws, which require that consent thereto be authorized by resolution of the Board of Directors or given in writing by a majority of the Directors or by written consent or vote of Tenant-Shareholders owning at least 66- %% of the Apartment Corporation’s outstanding shares.” (Emphasis added.)
Paragraphs 16 (a), (i) through (vii) relating to assignments of the proprietary lease provide as follows:
“16. (a) Except as provided otherwise in this lease, the Lessee shall not assign this lease or transfer the shares * * * and no such assignment or transfer shall take effect as against the Lessor for any purpose, until:
“(i) An instrument of assignment in form approved by the Lessor executed and acknowledged by the assignor shall be delivered to the Lessor; and
*438 “(ii) An agreement executed and acknowledged by the assignee in form approved by Lessor assuming * * * all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment shall have been delivered to the Lessor, or, at the request of the Lessor”.
These provisions of the subscription agreements executed during and between April 23 through 29, 1981, according to plaintiffs, were inserted to discourage speculative “flip-overs” by nonpurchasing tenants prior to title closing at “enormous profit at our expense”. The building’s title closing to University Mews from plaintiff Sponsor to plaintiff (co-operative) Apartment Corporation was scheduled to and did take place on July 1, 1981 with later individual title closings for the purchase by co-operative stockholders, of the Apartment Corporation shares and execution of proprietary lease to particular apartments therein.
Thereafter, on May 8, 1981, the Sponsor duly declared the Offering Plan, effective May 8,1981, under the Martin Act (General Business Law, § 352-eee). Subsequently during June, 1981, plaintiffs discovered by checking and responding to the New York Times realty ads, and contacting realty brokers under fictitious names, that each defendant had allegedly violated his, her or their subscription agreement by “arranging for outsiders to purchase their apartments for them and then to resell to these outsiders keeping substantial profit for themselves”. On or about June 25, 1981, plaintiff commenced the original underlying action. Thereafter, it became “apparent we were going to become involved in very substantial litigation were we to prohibit the defendants from closing title on their apartments. We, therefore, elected to permit the defendants to close” after July 1,1981. This act, according to defendants, constituted waiver and estoppel.
E. APPLICABLE STATUTES
This court’s review of section 352-e of the General Business Law, the New York State Attorney-General’s rules and regulations promulgated thereunder; the RSL and its RSC (§ 61) thereunder, the Co-operative Corporations Law, Private Housing Finance Law or Uniform Commercial *439 Code do not indicate any applicable provisions. Section 5-1107 of the General Obligations Law requires an assignment, in the absence of consideration, to be in writing and signed by the party to be charged. Section 13-101 of the General Obligations Law allows any claim or demand to be transferred except: to recover damages for a personal injury; founded upon a grant or claim or interest in realty, voided by statute, or expressly barred by statute or contrary to public policy.
F. APPLICABLE COMMON AND CASE LAW
In the absence of statute, a right or interest is assignable only if at the time of assignment it had an actual or potential existence (Fairbanks v Sargent, 117 NY 320; 6 NY Jur 2d, Assignments, §§ 20-22, pp 256-259). However, in equity such is recognized and takes effect when the thing assigned comes into existence, provided the assignment was fairly made, is supported by sufficient consideration, is not contrary to public policy, and no superior right has arisen in the meantime. (Williams v Ingersoll, 89 NY 508; Central Trust Co. v West India Improvement Co., 169 NY 314; Matter of Strange, 164 Misc 929.) Even the slightest consideration may be sufficient. (Matter of Williams Press v Flavin, 74 Misc 2d 1082, affd 44 AD2d 634, affd 35 NY2d 499.)
The assignee’s interest, commonly known as an equitable lien, will be recognized and protected in equity (Holmes v Evans, 129 NY 140), unless expressly prohibited by statute (see General Obligations Law, § 13-101, subd 3); public policy (right of re-entry breach of condition subsequent in realty, Trustees of Calvary Presbyt. Church v Putnam, 221 App Div 502, affd 249 NY 111), or contract (Allhusen v Caristo Constr. Corp., 303 NY 446).
New York courts generally recognize and enforce a contract provision prohibiting its assignment (Fortunato v Patten, 147 NY 277; Allhusen v Caristo Constr. Corp., supra; Validity of Anti-Assignment Clause in Contract, Ann., 37 ALR2d 1251-1270); and even a right to contest nonassignability (Matter of Campbell, 164 Misc 632). However, a stipulation against assignment may be waived (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395) *440 or modified by a course of business dealings or by a formal written instrument. (Lobee v Denby Motor Truck Co., 163 NYS 951.)
Where there is no public policy or statutory bar to the assignment of a particular contract, the court examines the parties’ intention as expressed in the particular contract or agreement (Diamond Match Co. v Roeber, 106 NY 473; Paige v Faure, 229 NY 114; see General Obligations Law, § 13-101).
For a contractual clause forbidding or restricting an assignment of rights thereunder to reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way. (See Allhusen v Caristo Constr. Corp., 303 NY, at p 450; 3 Williston, Contracts, § 422, p 130, n 6.) Such must specifically eliminate the power as well as the right to assign the contract in violation of its bar or restrictions, otherwise the original obligor is given only the right to damages for its breach, but does not render the assignment ineffective. (See Restatement, Contracts 2d, § 322, subd [2], par [b]; see, also, Cedar Point Apts, v Cedar Point Inv. Corp., 693 F2d 748, 754, n 4; Murray, Contracts [2d rev ed], § 306, p 623.) Under CPLR 3025 (subd [b]) leave for amendments and supplementary pleadings shall be freely given upon such terms as may be just (Fugazy Travel Bur. v Ernst & Ernst, 31 AD2d 924).
Upon a CPLR 6301, 6311 motion for a preliminary injunction, movant has the burden of proof to show a clear right to such a “drastic remedy” by demonstrating: (1) reasonable likelihood of ultimate success upon the merits; (2) irreparable injury absent such relief; and (3) the balance of the equities lies in movant’s favor. (After Six v 201 East 66th St. Assoc., 87 AD2d 153, 155, app dsmd 57 NY2d 835; Cooper v 140 East Assoc., 33 AD2d 60; Rohauer v Killiam, 37 AD2d 547; Albini v Solork Assoc., 37 AD2d 835.) Movant’s implicit request for the provisional remedy of attachment must satisfy the predicate grounds set forth in CPLR 6201. (See Maitrejean v Levon Props. Corp., 45 AD2d 1020.) It is a harsh statutory remedy, which courts *441 have strictly construed against the seekers (Siegel v Northern Blvd. & 80th St. Corp., 31 AD2d 182, 183).
Finally, upon a CPLR 3212 motion or cross motion for summary judgment, this court’s role is the finding, not determination of material triable issues of fact. (Sillman v Twentieth Century-Fox Film Corp., supra; Esteve v Abad, 271 App Div 725; Fabricant v Rector, Churchwardens & Vestrymen, 91 AD2d 906, 907; Zuckerman v City of New York, 49 NY2d 557, 562.)
G. FINDING
After a full and thorough review of all relevant, material facts and circumstance set forth in the parties’ motional submissions, this court finds, in fact and law, that plaintiffs failed to sustain their motional burden of proof to justify involving the drastic provisional remedy of either a preliminary injunction under CPLR 6301, 6311, or attachment under CPLR 6201. In denying a preliminary injunction, the court applies the three-prong case law criteria (last affirmed in After Sixv 201 East 66th St. Assoc., supra) as follows:
(1) Reasonable Likelihood of Ultimate Success Upon the Merits
While plaintiffs (Sponsor and Apartment Corporation) make a persuasive argument that the provisions of paragraph 7.A of subject subscription agreement during its lifetime effectively voided any legal assignment thereof without their prior written consent, such died at and after title closing with the purchase by tenants of their respective apartments by issuance, execution, and delivery of allocated Apartment Corporation stock and a proprietary lease, after plaintiffs knew of various defendants’ various agreements or contracts of sale to third parties.
However, a reasonable interpretation of the representation contained in paragraphs 10 and 12 of the subscription agreement that the tenant was respectively “purchasing the shares for my own account and not for the account of any other individual, corporation, partnership, trust or other entity” and “The purchase is for my personal occupancy” did not enable plaintiffs to eliminate either the tenant’s power or the right to assign or sell, at a profit over *442 the “inside(r’s)” price, the Apartment Corporation shares, effective after title closing upon compliance with paragraphs 16 (a) (i) through (vii) of the proprietary lease. In fact, this interpretation of its provisions and intent is confirmed by plaintiff’s own summary of the Offering Plan entitled “Assignments and Sublets” (see d. facts above for full text) which provided: “A Tenant-Shareholder may sell his shares and assign his Proprietary Lease *** at any time, in compliance with the * * * Proprietary Lease and * * * By-Laws”. (Emphasis added.)
Defendants’ contracts or agreements to sell before title closings are equitable assignments not prohibited by statute or public policy that became legal assignments upon title closing. (See 6 NY Jur 2d, Assignments, § 2, p 233, and the authorities cited therein.)
Thus plaintiffs have failed to show reasonable likelihood of ultimate success upon the merits.
(2) Irreparable Damage Absent Such Relief
In paragraph 5 of their “Reply Affidavit”, dated August 13, 1981, plaintiffs’ principal Harvey P. Katz, deposed: “this action was commenced well before any closings and the decision to close despite the fact that defendants had violated the terms of their subscription agreements was based upon the judgment this controversy could be more expeditiously resolved by the adjudication of this action, than by plaintiffs’ ‘self-help’ and the substantial further litigation which would likely result therefrom”. It would appear that plaintiffs, if not subject to waiver and estoppel (see Sillman v Twentieth Century-Fox Film Corp., supra) have concededly and knowingly opted for damages over equitable, injunctive or attachment, relief in the light of their choice to proceed with the title closings, rather than voiding the subscription agreements.
Any broader bar, which would effectively prohibit outside financing by a lending institution or private party or any assignment or sale mandating tenant-shareholders’ lifetime occupancy, would be contrary to statute (General Obligations Law, § 13-101), which codified common law and public policy of freedom of contract and be unconscionable, as a matter of law (see Uniform Commercial Code, *443 § 2-302, subd [1], as added by L 1962, eh 553, eff Sept. 27, 1964).
This freedom of assignment, despite the subscription agreement bar, applies to a so-called “flip-over” by tenants where the contract to sell is executed before title closing, so long as it is effective thereafter following tenants-shareholders’ personal occupancy, however brief, of the co-operative apartment and is subject to tenant-shareholder’s compliance with (above-cited pars 16 [a] [i] through [vi]) the proprietary lease, whereunder the Apartment Corporation may set reasonable legal and other expenses including a so-called “flip” tax. (See par 16 [a] [iv].) (See Jamil v Southridge Coop., 93 Misc 2d 383, revd on other grounds 102 Misc 2d 404 [App Term, 2d dept], affd 77 AD2d 822, cert den 450 US 919, reh den 450 US 1050.)
(3) Balancing the Equities
Here plaintiffs have not clearly shown the balance of the equities in their favor. Plaintiffs were, admittedly, well aware, through brokerage checks and undercover impersonations of defendants agreements during May and June, 1981. This knowledge was well before the July, 1981 title closings, which proceeded well beyond the May 8, 1981 effective date of plaintiffs’ Offering Plan, presumably to maximize plaintiffs’ profits. It would appear plaintiffs, who fixed the respective inside(r’s) and outside(r’s) prices in the Offering Plan by subject motion, now seek to monopolize all profits in a rising co-operative sales market and deny any profits to tenant-shareholders. While some tenant-shareholders’ tactics are subject to criticism, such does not support the required balancing of the equities in plaintiffs’ favor.
To the extent plaintiffs seek CPLR article 62 attachment, as a provisional remedy, such is denied for failure to comply with the predicate grounds set forth in CPLR 6201.
H. CONCLUSION
Accordingly, by reason of the foregoing, in the interest of justice and this court’s reasonable discretion, (1) plaintiffs’ CPLR 3025 (subd [b]) motion for leave to serve and file a supplemental summons and amended complaint is granted to add additional party defendants, including tenant- *444 shareholders and assignees, and causes of action, including relief for damages, and plaintiffs shall duly serve and file their supplemental summons and amended complaint within 30 days after service of a true copy of the order to be settled herein, with notice of entry; and (2) plaintiffs’ CPLR 6301, 6311 motion for a preliminary injunction is denied; defendant’s (Sothern) CPLR 3212 cross motion for summary judgment is denied, without prejudice to renew, following joinder of issue after service of all amended pleadings herein.