702 A.2d 1315

GARDEN STATE BUILDINGS, L.P., PLAINTIFF, AND NORWALK HOTEL ASSOCIATES, PLAINTIFF–APPELLANT, v. FIRST FIDELITY BANK, N.A., AND STARWOOD APOLLO HOTEL PARTNERS III, L.P., DEFENDANTS, AND MIDLANTIC NATIONAL BANK, BY PNC BANK, N.A., ITS SUCCESSOR IN INTEREST, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 21, 1997—Decided November 20, 1997.

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Charles A. Reid, III* argued the cause for appellant (*Shanley & Fisher*, attorneys; *Mr. Reed* and *Eunice E. Lee*, on the brief).

*Philip R. White* argued the cause for respondent (*Sills Cummis Zuckerman Radin Tischman Epstein & Gross*, attorneys; *Mr. White*, of counsel and on the brief and *Joshua D. Goodman*, on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Plaintiff Norwalk Hotel Associates ("Norwalk" or "plaintiff"), a partnership, appeals from a summary judgment in favor of defendant Midlantic National Bank ("Midlantic" or "defendant") by its successor in interest, PNC Bank, N.A.,[1] because the trial judge found that Norwalk ratified Midlantic's assignment of Norwalk's loan to defendant Starwood Apollo Hotel Partners III, L.P. ("Starwood"), which assignment was made in contravention of an anti-assignment clause in the loan documents.

---

[1] PNC Bank, N.A., Midlantic's successor in interest, is the actual respondent in this appeal. We will, however, refer to Midlantic which had been the entity with which plaintiff interacted in the transactions relevant to this appeal.

Prior to April 1987, plaintiff entered into a long-term lease of commercial property located in Norwalk, Connecticut on which it intended to build a Days Inn Hotel. By a commitment letter dated April 10, 1987, defendant agreed to provide $5,500,000 in construction and interim financing to plaintiff for development of this property.

Pursuant to the commitment letter, plaintiff and defendant executed a construction loan agreement dated July 14, 1987. The loan was non-recourse as to plaintiff and its partners. At the same time, plaintiff delivered to defendant a promissory note in the amount of $5,500,000, with a maturity date of July 1, 1990. Plaintiff had the option of extending the maturity date for two one-year periods upon the payment of $27,500 for each such extension.

The note was secured by, among other things, a leasehold mortgage, deed and security interest covering plaintiff's leasehold interest in the property, and the guaranty of Garden State Buildings ("Garden State"), an affiliate of Norwalk, as well as of others. Pursuant to the loan agreement, plaintiff delivered to defendant an unconditional and irrevocable letter of credit in the amount of $1,375,000 to secure its obligations under the agreement. Garden State secured such a letter of credit from First Fidelity Bank, naming defendant as the beneficiary. The letter of credit originally matured on August 1, 1990, and was renewed four times with a final expiration date of August 1, 1994.

The hotel was completed and operational in 1988. Plaintiff obtained two extensions of the loan maturity date such that it was to mature on July 1, 1992. However, plaintiff was unable to pay off the loan at maturity and defaulted on the loan, because of "drastically changed" market conditions "relating to commercial real estate in general and hotels in particular."

As a result, plaintiff and defendant negotiated and executed a Construction Loan Modification Agreement (referred to throughout the parties' briefs by the acronym "CLAMA," a practice which we, albeit idiosyncratically, decline to follow), as of July 1, 1992.

Pursuant to section 2.1 of the Modification Agreement, the maturity date of the loan was extended to July 1, 1995, and defendant was released from its obligation to make any further advances under the loan. At the same time, plaintiff executed and delivered to defendant an amended and restated promissory note, dated as of the modification date, and a mortgage modification agreement. Garden State and the other guarantors executed their consents and reaffirmed their guaranties in mid-December 1992.

Plaintiff contends that the Modification Agreement was unusual because it gave defendant "broad powers . . . over the disposition of hotel revenues." Defendant also required as part of the security package an escrow agreement and escrow documents, including an assignment of plaintiff's leasehold interest in the property, a bill of sale covering the personal property located on the property, and a deed covering the hotel and other improvements on the property. Plaintiff was additionally required to maintain with defendant an operating account and a "FF & E Fund." [2] Plaintiff was required to deposit into or cause to be deposited into the operating account all collected funds in its accounts, all fees paid by the management company to plaintiff, and all other revenues received from any other source. With the exception of certain specified expenditures, no disbursements were permitted to be made from this account or any other accounts without defendant's approval.

Section 11.2 of the Modification Agreement provided, in pertinent part:

> This Letter Agreement, the Mortgage Modification and the 1992 Note encompass all the modifications to the Loan, notwithstanding any oral communications between the parties. *No further modification shall be deemed effective, unless in*

---

[2] The meaning of the abbreviation "FF & E" is not explained in the Modification Agreement or in the parties' briefs. We assume it refers to "furniture, fixtures and equipment," but further inquiry is unnecessary. With regard to the FF & E Fund, plaintiff was required to compute net operating income and another amount called the "transfer amount" monthly for deposit. Defendant would disburse amounts in this fund for capital improvements, and maintenance and preservation expenditures.

*writing, executed by both parties....* No amendment or waiver of any provision of this Letter Agreement, the Mortgage Modification or the 1992 Note, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

[Emphasis added].

In addition, section 11.15 reiterated that "to avoid any confusion or misunderstanding, this Letter Agreement may only be amended in writing."

Section 11.3 of the Modification Agreement contained the non-assignability clause. It stated:

The terms and provisions of the Lending Documents shall be binding upon the parties hereto, their successors and permitted assigns. *No party hereto shall assign this Letter Agreement* (or assign any right or delegate any obligation contained herein) *without the prior written consent of the other party hereto and any such assignment without such consent shall be void.*

[Emphasis added].

Plaintiff contends that this provision combined with section 2.4 of the Modification Agreement, which gave plaintiff the right to prepay the 1992 Note at any time without a prepayment penalty, upon delivery of the required notice, permitted it to "prevent the assignment of the [Modification Agreement] and its broad powers to another entity" and gave it "an opportunity to buy its own loan at a discounted price."

Plaintiff waived its right to a jury trial in section 11.1 of the Modification Agreement. Also, all of the original and modified loan documents and the documents executed in connection therewith were to be construed and enforced in accordance with the laws of Connecticut.[3]

---

[3] Neither party claims that Connecticut law differs from New Jersey law. Therefore, we will assume that they are the same. *Canal Ins. Co. v. F.W. Clukey Trucking Co.,* 295 *N.J.Super.* 131, 143, 684 *A.2d* 953 (App.Div.1996); *Unifoil Corp. v. CNA Ins. Cos.,* 218 *N.J.Super.* 461, 467 n. 1, 528 *A.2d* 47 (App.Div.1987). We will, however, discuss the Connecticut Unfair Trade Practices Act, *Conn. Gen.Stat.* § 42–110a *et seq.,* later.

In the summer of 1993, Midlantic was under pressure from bank regulators and investors to sell its "high level" of problem loans. It therefore assembled a portfolio of those of its hotel and hospitality asset loans that were considered problems because of the type of collateral, the payment record, or the borrower's ability to repay. Midlantic additionally included loans outside of its usual market area, which was New Jersey and Pennsylvania. Plaintiff's loan, although current in payment, was included in the bulk sale, in part because of other non-performing loans to related entities, which indicated a "weakened condition" and "risk of loss" to defendant, and in part because the loan was outside defendant's market area. Defendant received a price for the loans that was "less than the original aggregate contract balances of these loans."

Defendant entered into the loan purchase agreement, dated August 27, 1993, with a nominee of Starwood, pursuant to which Starwood agreed to purchase plaintiff's loan from defendant for a price of $2,203,604.49,[4] as part of a bulk sale of similar hotel loans. Defendant sold and assigned the loan, the related loan documents, and all of defendant's interest therein to Starwood pursuant to a loan document assignment, dated September 27, 1993.

Defendant failed to obtain plaintiff's consent before making the assignment to Starwood. In fact, in September 1993, before the assignment, plaintiff communicated with defendant and asked whether the loan was "being sold as part of a bulk sale." Defendant indicated that it would not respond to the inquiry. Midlantic's "policy was not to discuss impending bulk sales with borrowers" since there was a concern that loan officers might attempt to negotiate a separate deal for their borrowers.

Starwood began receiving the payments made by plaintiff to Midlantic as of the October 1, 1993 interest payment. It appears

---

[4] Defendant contends that this was merely an allocation price and did not represent the true value of the land. Andrew P. Siwulec, an officer of Midlantic, testified that defendant would have sold the loan to plaintiff at a higher price than, as here, in a bulk sale to a third party with "no intimate knowledge of the assets."

that Midlantic forwarded these payments to Starwood. After plaintiff received notice of the assignment, Starwood received the interest payments directly from plaintiff, beginning with the January 1, 1994 payment.

In a letter, dated February 7, 1994, addressed to Starwood, plaintiff stated, in part, that "in reliance upon the Loan Document Assignment dated as of September 27, 1993, by Midlantic National Bank to you, the undersigned hereby ratifies its acknowledgment and agreement to you as the assignee of the Loan and related loan documents." This letter indicated that the ratification was being given because plaintiff was meeting with Starwood on February 9, 1994, to discuss a loan to an affiliate. During argument on the motion, plaintiff's counsel contended that plaintiff signed this letter because Starwood refused to negotiate a defaulted loan with a related entity, unless plaintiff signed the letter. In its answers to interrogatories, plaintiff explained that it delivered this letter because once it learned that defendant assigned the loan to Starwood, it "had no choice but to treat the assignment as valid as to Starwood." [5]

In a March 26, 1994 letter, Starwood advised defendant of Starwood's notice of claim resulting from defendant's failure to obtain plaintiff's written consent to the assignment of its loan as required by section 11.3 of the Modification Agreement. The claim was necessary because plaintiff was disputing the assignment as it affected its rights against defendant. Starwood was concerned that if plaintiff challenged the assignment as improper, Starwood would not be able to enforce its remedies under the loan documents and would incur legal expenses. Starwood did not ask

---

[5] Such reasons cannot constitute duress. *Continental Bank of Pa. v. Barclay Riding Academy, Inc.*, 93 *N.J.* 153, 175, 459 *A.2d* 1163, *cert. denied*, 464 *U.S.* 994, 104 *S.Ct.* 488, 78 *L.Ed.2d* 684 (1983). The mere exertion of financial pressure on one in financial distress is not duress. *Id.* at 177, 459 *A.2d* 1163. See also 13 *Williston on Contracts* § 1617 at 708 (Jaeger ed.1970) and cases cited in § 1618A (1970 ed. & Supp.1997). We therefore accept the letter as plaintiff's recognition of the assignment. But, as explained later, the effect of the letter on plaintiff's claim against defendant remains open.

defendant to take any action, since it believed it "may have resolved this issue;" however, it requested that defendant "keep this matter confidential as disclosure to the borrower or its affiliates could adversely affect [Starwood's] position." By agreement dated as of September 27, 1994, defendant agreed with Starwood that if the loan were required to be transferred back to defendant, "all payments actually received by it in respect of the Norwalk Loan [would] be promptly paid over to Starwood." The purpose of this provision was to insure that Starwood would be treated as a participant in the loan and receive the economic benefit derived thereunder even if it were returned to defendant.

In June 1994, Starwood asked plaintiff on at least two occasions to sign a pre-negotiation letter containing the same language as the February 7, 1994 letter in connection with plaintiff's request to modify the loan terms. However, plaintiff refused to sign the letter, objecting to the acknowledgment provision.

In or around June 1994, Starwood requested that plaintiff secure the renewal of the letter of credit, and allegedly threatened to draw on the letter of credit if plaintiff refused, which plaintiff asserted was wrongful since no default existed. Plaintiff failed to comply with Starwood's demands and instead filed a complaint in an effort to prevent a draw on the letter of credit. By a letter dated June 30, 1994, Starwood advised plaintiff that it was in default under the terms of the loan agreement and the Modification Agreement for failure to pay taxes and interest. Thereafter, on or about July 29, 1994, Starwood, through defendant, drew on the letter of credit.

Pursuant to a settlement agreement, dated July 17, 1995, plaintiff settled its disputes with Starwood with respect to the complaint and a foreclosure action which Starwood instituted in Connecticut. Plaintiff conveyed the hotel to Starwood, and Starwood returned $400,000 to plaintiff. Plaintiff contends that the settlement cost it $4,775,000, because the hotel property was appraised at $3,800,000 and it still owed $975,000 on the letter of credit.

In conjunction with the Starwood settlement, plaintiff executed and delivered an undated release containing the following representations by plaintiff:

(a) Starwood is the true and lawful owner of the Mortgage Loan Obligation and the Mortgage Documents which are legally binding obligations enforceable by Starwood against Norwalk and the Guarantors; (b) Norwalk owes the Mortgage Loan Obligation to Starwood and has waived and released all defenses, offsets and counterclaims.

In addition, the release stated:

(c) as set forth more fully in release by the undersigned dated of even date herewith (the "Release"), Norwalk, GSB and the Guarantors hereby waive and forever release Starwood only from any claims any of them have or may have against Starwood with respect to the assignment to Starwood of the Mortgage Loan Obligation and the Mortgage Loan Documents; ... (f) *The provisions of subparagraphs (a), (b), (c) and (e) hereof are intended for the benefit of Starwood, and Starwood's successors and permitted assigns only and no other person or entity, and any such claims against persons or entities other than Starwood are expressly reserved by Norwalk, GSB and the Guarantors....*

[Emphasis added].

The trial judge held that plaintiff ratified defendant's assignment of the Modification Agreement to Starwood and thus was barred from asserting any claim against defendant for wrongful assignment of the loan. The court found that plaintiff's conduct between the assignment and the filing of the lawsuit supported this holding, namely, plaintiff made payments to Starwood without protest or reservation; in its February 7, 1994 letter, plaintiff acknowledged that it ratified the assignment; and in its settlement with Starwood, plaintiff acknowledged that Starwood was the " 'true and lawful owner' of the loan documents." The judge further stated:

[P]laintiffs made a conscious decision to accede to the assignment of the [Modification Agreement] and made no attempt to void it. Once having ratified it, Garden State Buildings can not now seek damages resulting from a breach of contract which they ratified and made no attempt to void.

On this basis, the judge granted summary judgment in favor of defendant.

Plaintiff contends that it was not required to void the assignment between defendant and Starwood after discovering it, but could pursue its damage remedy against defendant while acknowl-

edging Starwood as the party controlling the loan. Plaintiff also contends that it did not, vis-a-vis defendant, ratify the assignment to Starwood.

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *R.* 4:46–2(c). *See Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). However, "[t]o send a case to trial knowing that a rational jury can reach but one conclusion, is indeed 'worthless' and will 'serve no useful purpose.' " *Id.* at 541, 666 *A.*2d 146.

The *Restatement (Second) of Contracts* § 322 (1981) deals with contractual prohibitions of assignment. It states in pertinent part:

(2) A contract term prohibiting assignment of rights under the contract, *unless a different intention* is manifested,

. . . .

(b) *gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective;*

(c) is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition.

[*Restatement (Second) of Contracts* § 322(2)(b) & (c) (emphasis added).]

We have been unable to locate any New Jersey or Connecticut cases that have interpreted this section, thus we rely on foreign case law.

■ The parties' contrary intention as referred to in *Restatement (Second) of Contracts, supra,* § 322(2) may be manifested in the express language of the contractual provision. *Cedar Point Apts., Ltd. v. Cedar Point Investment Corp.,* 693 *F.*2d 748, 754 n. 4 (8th Cir.1982), *cert. denied,* 461 *U.S.* 914, 103 *S.Ct.* 1893, 77

L.Ed.2d 283 (1983); *University Mews Assocs. v. Jeanmarie,* 122 *Misc.*2d 434, 471 *N.Y.S.*2d 457, 461 (N.Y.Sup.1983). "[T]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way." *University Mews Assocs., supra,* 471 *N.Y.S.*2d at 461. *Accord Cedar Point Apts., Ltd., supra,* 693 *F.*2d at 754 n. 4; *Sullivan v. International Fidelity Ins. Co.,* 96 *A.D.*2d 555, 465 *N.Y.S.*2d 235, 237 (N.Y.App.Div.1983). Otherwise, the assignment is effective, and the obligor merely has the right to damages. *Ibid.*

█ Here, section 11.3 of the Modification Agreement specifically stated: "No party hereto shall assign this Letter Agreement . . . without the prior written consent of the other party hereto and any such assignment without such consent shall be void." This language evidences the parties' intent to render invalid any assignment that was not obtained with the consent of the other party. *Cedar Point Apts., Ltd., supra,* 693 *F.*2d at 754 n. 4; *Spinex Lab. Inc. v. Empire Blue Cross and Blue Shield,* 212 *A.D.*2d 906, 622 *N.Y.S.*2d 154, 155 (N.Y.App.Div.1995); *University Mews Assocs., supra,* 471 *N.Y.S.*2d at 461. Since defendant did not obtain plaintiff's consent before assigning the loan to Starwood, plaintiff, contrary to its concession on appeal, had the right to invalidate the assignment to Starwood, and was not forced to accept it as a fait accompli.[6]

Thus plaintiff had three actions it could take: (1) it could have attempted to void the assignment; (2) it could have recognized the

---

[6] In fact, section 9.5 of the loan purchase agreement between defendant and Starwood contained a mechanism for returning or reselling loans to defendant, at its option. For example, if, as occurred here, defendant failed to obtain a required consent to assignment and thereby breached its representation in section 4.2(b)(iii), and such breach adversely affected the value of the loan in a material manner, the loan might be returned to defendant. Thus, defendant may have been obligated to repurchase the loan and effectively undo the assignment under this provision, because plaintiff had the right to void the assignment.

assignment, but retained its rights against Midlantic; (3) it could have accepted the assignment and also waived its rights as to Midlantic. Plaintiff contends that it followed the second course, although it also appears initially to have intended to void the assignment. But for the express power to void the assignment, plaintiff would have been limited to the second or third option. Defendant, of course, claims that plaintiff has chosen the third option.

To resolve this conflict, we must explore the law governing waiver of anti-assignment clauses. An anti-assignment clause protects the obligor and does not affect the transaction between the assignor and the assignee. *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 452 *F.*2d 1346, 1351 (D.C.Cir.1971). It is for the benefit of the non-assigning party to the contract, but the power to void the assignment can be waived either before or after the assignment. 4 *Corbin on Contracts* § 873, at 496 (1951); *Orange Motors, Inc. v. Meyer*, 107 *N.J. Eq.* 461, 464–66, 149 *A.* 811 (E. & A.1930) (finding that a landlord waived its right to void an assignment of a lease by consenting in writing to the renewal of the lease by the tenants and the corporation to which the lease had been assigned). "Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Sys. Corp.*, 111 *N.J.* 276, 291, 544 *A.*2d 377 (1988). This principle is also applied in an anti-assignment setting. *See Sillman v. Twentieth Century–Fox Film Corp.*, 3 *N.Y.*2d 395, 165 *N.Y.S.*2d 498, 504, 144 *N.E.*2d 387 (1957). "A mere expression of willingness, made to either the assignor or the assignee, acted on by them, makes the assignment effective." *Corbin, supra* § 873 at 496. Furthermore, "tacit permission, after notice of the assignment, that the assignee may continue performance, amounts to a waiver." 3 *Williston on Contracts* § 422 at 141 (Jaeger 3d ed.1960). Other cases appear to require a more expressive waiver. While this appears to express a minority view, it is the view of

New Jersey. *Deerhurst Estates v. Meadow Homes, Inc.*, 64 *N.J.Super.* 134, 145, 165 *A.*2d 543 (App.Div.1960), *certif. denied*, 34 *N.J.* 66, 167 *A.*2d 55 (1961) (requiring a "voluntary, clear and decisive act, implying an election to forego some advantage which the waiving party might have insisted on"); *Paul v. Chromalytics Corp.*, 343 *A.*2d 622, 626 (Del.Super.Ct.1975) (an obligor's waiver of an anti-assignment clause must be " 'clear, distinct and unequivocal' "). Provided that this more aggressive standard is met, an anti-assignment clause may be waived by a written instrument, a course of dealing, or even passive conduct, *i.e.*, taking no action to invalidate the assignment *vis-a-vis* the assignee. *University Mews Assocs., supra*, 471 *N.Y.S.*2d at 461; *Belge v. Aetna Cas. & Sur. Co.*, 39 *A.D.*2d 295, 334 *N.Y.S.*2d 185, 189 (N.Y.App.Div.1972). Such waiver is basically a question of intention, and usually a matter for the trier of fact. *Sillman, supra*, 165 *N.Y.S.*2d at 504, 144 *N.E.*2d 387.

■ These authorities, however, do not distinguish between the waiver of the right against the assignee to void the transaction and the waiver of a right to claim damage from the assignor for breach of the anti-assignment clause. We have no question that plaintiff waived its right against Starwood to void the assignment. Its letter and payments to Starwood and the later release make this clear. The real issue is whether plaintiff's actions following the assignment constitute a waiver of plaintiff's claims against defendant for its breach of section 11.3 of the Modification Agreement. Such a waiver would preclude a subsequent claim for damages. *Silver Creations, Ltd. v. United Parcel Serv.*, 133 *N.J.Super.* 543, 549, 337 *A.*2d 641 (Law Div.1975). Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement. *Ballantyne House Assocs. v. City of Newark*, 269 *N.J.Super.* 322, 334, 635 *A.*2d 551 (App.Div.1993).

■ In this case, plaintiff admits in its brief that sometime after the assignment, plaintiff learned that the loan had been assigned

to Starwood. It does not claim, and the record does not reflect, that any immediate objection to Midlantic was raised to the assignment. The breach, however, had already occurred. Plaintiff was not under any obligation to prevent an act that had already taken place without its consent, especially after it had earlier voiced its concern about the possible transaction, but was informed that no information would be given. As we have noted, in the February 7, 1994 letter addressed to Starwood, plaintiff "ratifie[d] its acknowledgement and agreement, to [Starwood] as the assignee of the Loan and related loan documents." Plaintiff contends that it did not intend to ratify defendant's actions by this language, because the letter was neither addressed to nor sent to defendant. Plaintiff was only acknowledging and waiving its rights to void the agreement. In terms of the Restatement, the assignment was not rendered "ineffective." *Restatement (Second) of Contracts* § 322(2)(b). Defendant argues to the contrary that plaintiff cannot create an ambiguity as to the ratifying effect of this letter by "stating that its intent was only to waive claims with respect to Starwood, not Midlantic."

This unartfully drawn provision clearly may be subject to more than one interpretation. It may constitute a ratification of the assignment or it may, as plaintiff contends, constitute merely a recognition of Starwood as the assignee of the loan. Although the construction of a written contract is usually a matter for the court, where its meaning is "uncertain or ambiguous and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provision should be left to the jury." *Michaels v. Brookchester, Inc.*, 26 *N.J.* 379, 387, 140 *A.*2d 199 (1958). The record indicates that Starwood required such a letter before it would negotiate the terms of another defaulted loan with plaintiff's affiliate. This fact, however, could either suggest that plaintiff was both approving the actions of the assignee and the validity of the assignment, or that it merely was confirming the assignment rights of Starwood, which had asserted its economic leverage on

plaintiff.[7]

In granting the summary judgment, the judge relied upon *Thermo Contracting Corp. v. Bank of New Jersey*, 69 *N.J.* 352, 354 *A.*2d 291 (1976). Defendant also relies upon this case here. *Thermo Contracting*, however, is distinguishable from the case before us, because it involved the issue of whether a principal by its actions ratified its agent's unauthorized endorsement of checks. *Id.* at 355, 362, 354 *A.*2d 291. Although ratification principles are similar to the waiver of breach principles, in our case we have neither a principal-agent relationship nor unauthorized endorsements, but rather potential, and different, claims against two parties, and the evidence could support a waiver of the claims against one or both. The additional cases posited by defendant, *Clarkson v. Selected Risks Ins. Co.*, 170 *N.J.Super.* 373, 379, 406 *A.*2d 494 (Law Div.1979), (a principal-agent case), and *Silver Creations, supra*, 133 *N.J.Super.* at 553, 337 *A.*2d 641 (acceptance of a check as payment) are similarly distinguishable, both factually and legally.

We also reject defendant's estoppel argument. Defendant's estoppel argument is meritless, since defendant did not change its position based on an act of plaintiff. Defendant had made its assignment before plaintiff knew of its actions, and plaintiff soon thereafter notified defendant that plaintiff was preserving its right to claim damages from defendant's breach.

The trial court analyzed the case in terms of ratification of the assignment, without separately analyzing the two rights held by plaintiff. The more appropriate analysis would have been whether plaintiff waived defendant's breach of the anti-assignment clause. Ratification, which involves a determination of whether

---

[7] Plaintiff relies upon *Hannigan v. Township of Old Bridge*, 288 *N.J.Super.* 313, 319, 672 *A.*2d 257 (App.Div.), *certif. denied*, 144 *N.J.* 588, 677 *A.*2d 760 (1996), to support its contention that it has "the right to elect which of two inconsistent rights it intends to exercise." But plaintiff's premise is incorrect. Its rights were not inconsistent, they were cumulative.

the party had "intent to ratify plus full knowledge of all the material facts," may be determined as a matter of law. *Thermo Contracting, supra,* 69 *N.J.* at 361–62, 354 *A.*2d 291. *Accord Martin Glennon, Inc. v. First Fidelity Bank, N.A.,* 279 *N.J.Super.* 48, 60, 652 *A.*2d 199 (App.Div.1995), *appeal dismissed,* 142 *N.J.* 510, 665 *A.*2d 1104 (1995). But ratification relates to acts professed to have been performed on a person's behalf. *Martin Glennon, supra,* 279 *N.J.Super.* at 60, 652 *A.*2d 199. That is not the situation before us. There is some evidence in the record as discussed earlier, however, that suggests that a waiver occurred and other evidence that it had not. Questions of waiver are normally questions of intent and hence should not be decided on a summary judgment motion. *Shebar, supra,* 111 *N.J.* at 291, 544 *A.*2d 377. *See* Pressler, *Current N.J. Court Rules,* comment on *R.* 4:46–2 at 1362 (stating that summary judgment should not be granted where the claim or defense involves a party's state of mind such as claims of bad faith, fraud or duress (and, we would add, waiver)). We follow the Supreme Court's admonition that waiver issues, which turn on intent, should not be decided on a summary judgment basis. *Shebar, supra,* 111 *N.J.* at 291, 544 *A.*2d 377. Accordingly, we reverse the trial judge's grant of summary judgment in favor of defendant.

Assuming that plaintiff did not waive defendant's breach, defendant contends that there is an overarching issue, namely, that plaintiff cannot establish damages for a violation of the consent to assignment clause, because plaintiff did not have a right of first refusal that would permit it to purchase the loan at the discounted price. While this is true, plaintiff did have the right to prepay the loan at any time without a prepayment penalty. If defendant requested plaintiff's consent to the assignment, plaintiff may have been able to negotiate a suitable payoff of the loan, though perhaps not the same discount given to Starwood, and used the prepayment provision to prepay the loan. It was deprived of this opportunity, and the allocation price of the sale to Starwood is at least some evidence of the price for which defendant would have been willing to sell plaintiff's mortgage. In any case, as the

Appellate Division stated in *Hannigan, supra,* 288 *N.J.Super.* at 320, 672 *A.*2d 257, "[e]ven though money damages may facially seem rather speculative, plaintiff should be given the opportunity to attempt to prove such damages under the usual standards."

Lastly, plaintiff contends that defendant violated the Connecticut Unfair Trade Practices Act, *Conn. Gen.Stat.* § 42–110a *et seq.* The trial judge did not address this issue in ruling on the summary judgment, nor did he address any breach of fiduciary issues. In light of our reversal on the waiver issue requiring a trial, the Unfair Trade Practices Act issue and any breach of fiduciary issues should be left to the trial court following a full exploration of the facts of this case.

The summary judgment is reversed, and the matter is remanded to the Law Division for further proceedings.