799 A.2d 12 (2002)
351 N.J. Super. 486
MAYO, LYNCH & ASSOCIATES, INC., Plaintiff-Appellant,
v.
David POLLACK, Defendant-Respondent, and
Secaucus Municipal Utilities Authority; Town of Secaucus; Buck, Seifert & Jost, P.C.; Joseph Pini, Sr.; Joseph Pini, Jr.; Secaucus Town Council; Paul Amico; Anthony Impreveduto; Richard Manney; James Horan, Inc.; Patricia Horan; Dorothy Horan; Warren H. Berkle, Jr.; and Thomas P. Carrigan, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 2002.
Decided June 3, 2002.
*13 Richard Seltzer argued the cause for appellant.
Gerald D. Miller, Jersey City, argued the cause for respondent David Pollack (Miller, Meyerson, Schwartz & Corbo, attorneys; Mr. Miller, on the brief).
Before Judges BAIME, NEWMAN and AXELRAD.
The opinion of the court was delivered by NEWMAN, J.A.D.
Plaintiff, Mayo, Lynch and Associates, was an engineering firm retained by defendant Secaucus Municipal Utilities Authority (SMUA) to design and supervise expansion of a sewerage treatment plant. Defendant David Pollack was the SMUA's attorney. The construction contract was awarded to defendant James P. Horan, Inc. (Horan), whose principals were defendants Patricia and Dorothy Horan (the Horans). Defendants Warren H. Berkle, Jr. and Thomas P. Carrigan were principals of the companies that bonded Horan for the project. Buck, Seifert & Jost was the engineering firm that replaced plaintiff on the job. The other defendants were SMUA or municipal officials.
Three of the SMUA officials and the Horans were convicted of engaging in a bribery and bid-rigging scheme. Plaintiff contends that Pollack, who approved faulty bonds submitted by Horan, was involved in the scheme and thus liable under the New Jersey and the United States Racketeer Influenced and Corrupt Organizations Acts (NJRICO and USRICO), N.J.S.A. 2C:41-1 to -6.2, and 18 U.S.C.A. §§ 1961 to -1968.
In granting summary judgment to Pollack, the trial judge determined that there was insufficient evidence to support a finding that Pollack was aware of or knowingly engaged in the bid-rigging enterprise. Plaintiff appeals, arguing that the judge erred in dismissing its claims that Pollack engaged in racketeering activity and conspiracy under both NJ and USRICO.
We now reverse and reinstate the NJRICO and state and federal conspiracy claims and affirm the dismissal of the USRICO claim.

I.
Plaintiff filed a third amended complaint containing twenty-two counts in March *14 1994. Only the RICO claims against Pollack are in issue on this appeal (counts seventeen, eighteen and nineteen); all the other claims were resolved.
In counts seventeen and eighteen of the third amended complaint, plaintiff alleged that the SMUA hired it in 1986 as engineer, to design and oversee the expansion of the Koelle Boulevard Waste Water Treatment Plant. In response to the SMUA's advertisement, three companies submitted bids for the construction work. Plaintiff alleged that the Horans bribed defendants Joseph Pini, Sr., the chair of the SMUA, and Virginia Maione, its executive director, and others, "to use their official positions to arrange for the unlawful award of the construction contract" to Horan. Horan submitted a blank bid, which was opened last, and Maione wrote in $14,999,000, an amount lower than that of the other bidders.
The complaint further asserted that Maione and Pini, Sr. pled guilty in the United States District Court for the District of New Jersey "to accepting this bribe and bid-rigging," in violation of 18 U.S.C.A. §§ 1951 and 1952. Joseph Pini, Jr., the SMUA's chief inspector, admitted, in a plea agreement, to taking a $5000 bribe in connection with the project.
According to the complaint, the bid specifications required the bid to contain a bid bond and consent of surety from a surety licensed in New Jersey and listed on a U.S. Treasury Circular 570. However, Horan did not submit a consent of surety with its bid, and its bid bond, issued by National Sureco, was "blank as to price." Berkle, National Sureco's principal, later pled guilty in the United States District Court for the District of New Jersey to issuing false and fraudulent surety bonds, including this one.
At Pollack's request, after the bids were opened, Horan submitted a consent of surety from UASCO (United American Surety Company), which was neither licensed in New Jersey nor listed on the Treasury Circular.
Pollack examined the bids and, despite these deficiencies, determined that Horan's bid documents accorded with the specifications. The contract was awarded to Horan.
According to the complaint, UASCO issued performance and payment bonds for Horan, but it limited its liability to "the value of collateral posted by the contractor, which was valueless at the time of the contractor's default." Fidelity & Deposit Company of Maryland also issued payment and performance bonds for Horan, which were forged.
In count nineteen of the third amended complaint, plaintiff accused Pollack of conspiring with Pini, Sr., Maione and others "to conduct and participate in the affairs of the SMUA through a pattern of racketeering activities."
Plaintiff alleged that these defendants' violations of NJ and USRICO harmed plaintiff because it was forced to work with an incompetent contractor; "construction was delayed, the project exceeded budget, and the workmanship ... was shoddy and unprofessional."
On summary judgment, the following facts were developed in more detail. In a consent of surety, issued on May 27, 1987, the Aetna Casualty & Surety Company agreed to issue a performance and payment bond, "if the Contract for which the preceding Proposal is made be awarded to the corporation ... making the same." The bond listed Neri-Jarvis as the principal, but Neri-Jarvis was a Horan subcontractor.
In a bid bond, dated May 29, 1987, UASCO bound itself, on behalf of Horan, to the *15 SMUA "in the sum of 10% of Bid Dollars" for improvements to the Koelle Boulevard Wastewater Treatment Plant, if the SMUA accepted Horan's bid. The amount of the bid was left blank.
In a letter of June 2, 1987, UASCO wrote to the SMUA announcing that it intended to become the surety on the performance and labor and material bonds, on behalf of Horan, for the Koelle Boulevard Wastewater Treatment Plant project. UASCO disclaimed any liability if it did not issue the required bonds.
In a letter to the SMUA of June 2, 1987, Pollack asserted that he had reviewed "all the bid documents required to be submitted in accordance with SpecificationsImprovements to the Koelle Boulevard Waste Water Treatment Plant ... and it is my opinion that James P. Horan, Inc. has fully complied with same." Pollack stated that in his "legal opinion" the contract should be awarded to Horan, the lowest bidder.
Pollack certified that, during the bidding process and when he rendered his opinion, he did not know about the bid-rigging scheme, the blank Horan bid, and the bribes. He said that, when he rendered his opinion, he did not "have any knowledge that the bid documents submitted by James P. Horan were not in accordance with contract specifications. [He also] did not know that the consent of surety in the Horan bid was omitted and the bid bond was blank as to price in violation of the contract specifications."
Pollack further certified that he did not know that "the bid bond and the consent of surety were provided by UASCO, a company that was neither licensed to do business in New Jersey, nor on the U.S. Treasury Circular 570." Pollack admitted that these two criteria were "part of the bid specifications," but that he made no effort to determine whether UASCO met either of these requirements before he "wrote the letter," apparently referring to his June 2, 1987, letter certifying that the bonds complied with the specifications.
Maione, Patricia Horan and Pini, Sr. asserted that they were the only ones, together with Dorothy Horan, who knew that Horan's bid was blank and Maione filled it in; they also said that the Horans gave money only to Maione, the two Pinis and Frank Devon, the Secaucus municipal clerk.
Although no documentation appears in the record, plaintiff describes the federal court guilty plea of Maione to criminal conspiracy and her testimony that she demanded and received over $50,000 from Horan to influence the SMUA to award the contract to Horan. According to plaintiff, Maione admitted falsifying public bid documents to insure that Horan appeared to be the lowest bidder. Plaintiff asserts that the Pinis also pled guilty in federal court to "a conspiracy to accept bribes and extort kickbacks and violate the public bidding laws." Pini, Sr. testified that he and Maione demanded over $100,000 from Horan.
The judge found that Maione, the Pinis, Devon and the Horans were "prosecuted and convicted." Pollack admits that the bid-rigging conspiracy existed and that the participants pled guilty, noting that he was not indicted.
UASCO issued a performance bond on August 13, 1987, for $14,999,000 in favor of the SMUA, on behalf of Horan, the principal. However, UASCO limited its liability, "all other limits and conditions notwithstanding," to "the value of collateral assigned to it by the Principal." The bond further recited that Horan had issued a promissory note for $14,999,000 "as security for faithful performance of this contract."
*16 UASCO also issued a labor and material payment bond on August 13, 1987, for $14,999,000 in favor of the SMUA on behalf of Horan, with the same limit of its liability.
The Fidelity & Deposit Company bonds are not in the record, but Maione wrote about them to Patricia Horan on March 2, 1988:
On March 1, 1988, Mr. Louis Carlucci, Resident Vice President of Fidelity and Deposit Company of Maryland stopped in my office to request copies of the Performance and Payment Bonds submitted to the Authority in support of the Performance Bond written by United American Surety Ltd. for the [Koelle Boulevard Plant Expansion and Upgrade].
... Mr. Carlucci advised that his firm had no knowledge of the issuance of the aforementioned documents and further inferred that the "documents appeared to be fraudulent."
On March 4, 1988, Fidelity & Deposit Company's attorney wrote to Maione, transmitting an affidavit of March 3 of Charles Pecot, Vice President. Pecot asserted that both the performance bond and the labor and material bonds purportedly issued by Fidelity & Deposit Company on August 24, 1987, in favor of the SMUA on behalf of Horan, in connection with the Koelle Boulevard Waste Water Treatment Plant, were forged, fraudulent and invalid.
Maione said that she sent Pollack a copy of her March 2 letter to Horan. Maione said that she called Pollack the same day and "repeated the story" about the fraudulent Fidelity & Deposit bonds; Pollack responded: "We'll wait and see what happens." Maione told Phil Keifer, the town administrator, but could not recall his response.
Maione recalled that she also sent Pollack the Pecot affidavit and letter when she received them. Maione recalled that at the next SMUA meeting she asked Pollack how he was "going to handle this," and he answered: "Let it sit for now. We have the other bond."
Pollack wrote to the SMUA on July 17, 1989, stating that "a question arose" about the validity of UASCO's performance bond. Pollack explained that "further assurances were required." Pollack stated that, after consultation with his associate and bond counsel, "agreement was reached that our [re]quirements were met"; without further discussion Pollack opined that "the Performance Bonds are valid."
Nevertheless, on December 22, 1989, Pollack wrote to an attorney for the UASCO concerning the liability limits under the bond. He asked to be furnished a list of the collateral assigned by the principal to the surety and the value placed on the collateral by the surety. He inquired whether if any of the collateral assigned was encumbered by a lien, mortgage or other security interest. He also noted that there was a promissory note in the amount of $14,999,000 signed by Dorothy Horan, Patricia Horan and James P. Horan, Inc. as security for faithful performance and queried whether this was an additional form of security, separate and apart from the collateral previously mentioned.
Pollack further inquired whether the limitation of liability to the amount of the collateral affected the surety's obligation to cover the full amount of the damages suffered by SMUA.
Lastly, Pollack asked if there was a default in the completion of the contract whether UASCO would complete the contract. The litany of questions asked in his letter were questions that should have been asked approximately two years and four months earlier when the performance *17 and labor and material payment bonds were first issued.
On appeal, plaintiff argues that the trial court erred in granting Pollack's motion for summary judgment. We address the arguments in the following order: the State RICO count; the Federal RICO count, and the State and federal conspiracy counts under RICO.

II.
Plaintiff contends that the judge erred in dismissing his state and federal RICO claims. Plaintiff argues that the judge improperly determined that there was insufficient evidence that Pollack knowingly participated in the affairs of the bid-rigging enterprise.
In granting summary judgment, the trial judge had this to say.
The criminal enterprise was the association of Maione, the Pini's, Pini, Sr. and Pini, Jr., Dev[o]n and the Horans to rig the bids for their individual benefit. All of the facts set forth by the plaintiff and the legitimate inferences therefrom free from innuendo do not show in any way that Pollack had knowledge of the objectives of that association or enterprise or that he engaged in any activities knowingly to carry out the operations of the enterprise.
Mr. Pollack was the attorney for the SMUA. He had an obligation to render proper legal advice. Whether he rendered proper legal advice is another matter.
In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995), the Supreme Court explained that under this new summary judgment standard there is no genuine issue of fact if "there exists a single, unavoidable resolution of the alleged disputed issue of fact." The "essence of the inquiry" is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 536, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). The Court in Brill added: "Credibility determinations will continue to be made by a jury and not the judge." 142 N.J. at 540, 666 A.2d 146.
N.J.S.A. 2C:41-2(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity...."
Under the New Jersey statute, "racketeering activity" includes bribery, forgery, fraudulent practices and "all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes." N.J.S.A. 2C:41-1(1)(g) and (o). A "pattern of racketeering activity" requires "[e]ngaging in at least two incidents of racketeering conduct" that "embrace criminal conduct" and are interrelated. N.J.S.A. 2C:41-1(2)(d). Plaintiff contends that Pollack engaged in fraudulent practices in violation of N.J.S.A. 2C:21, which constituted a pattern of racketeering activity.
Under NJRICO, an "enterprise" includes "any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities." N.J.S.A. 2C:41-1(2)(c).
Pollack does not contest the existence of a RICO enterprise, but denies that he participated in it.
In State v. Ball, 141 N.J. 142, 175, 661 A.2d 251, cert. denied, sub nom. Mocco v. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, *18 133 L.Ed.2d 731 (1996), the Court interpreting N.J.S.A. 2C:41-2c, held that a person is "employed by or associated with an enterprise" if the person has a position or a connection with the enterprise that enables the person to engage or participate in the enterprise's affairs.
The Court in Ball explained that "to conduct or participate in the affairs of an enterprise means to act purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist or help effectuate the goals of the enterprise." Ibid. The Court noted that managerial or supervisory activities were not necessary; participatory conduct was sufficient, as long as the person had the requisite intent. Ibid.
Plaintiff submitted sufficient evidence to raise a fact issue whether Pollack purposefully and knowingly participated in the affairs of the bid-rigging enterprise. His presentation of the letters of June 2, 1987 and July 17, 1989, which he wrote, contained two blatantly incorrect legal opinions that the Horan bonds were valid insuring that Horan would obtain and retain the contract with the SMUA.
Horan, as a bidder for a contract to improve a public facility, was required to furnish a guarantee that if the contract was awarded to it, it would enter into the contract, and furnish any required performance bond. N.J.S.A. 40A:11-21. The amount of this bid bond must be ten percent of the bid, but not over $20,000. N.J.S.A. 40A:11-21. In addition, Horan was required to furnish a certificate from a surety stating that it would provide Horan with a performance bond in the amount required by the specifications. N.J.S.A. 40A:11-22.
As of April 1, 1999, these requirements were mandatory, to be submitted at the same time as the bid, and the failure to submit either of them "shall be deemed a fatal defect that shall render the bid proposal unresponsive and that cannot be cured by the governing body." N.J.S.A. 40A:11-23.2.
Even before the effective date of this provision, a certificate of surety and a performance bond in amounts substantially below the contract price were material and non-waivable deviations from the specifications that rendered the contract voidable. Pucillo & Sons, Inc. v. Tp. of Belleville, 249 N.J.Super. 536, 545-48, 592 A.2d 1218 (App.Div.), certif. denied, 127 N.J. 551, 606 A.2d 364 (1991). These defects not only undermine competitive bidding, id. at 547, 592 A.2d 1218, but they also deprive the public of protection from a possible breach on the part of the contractor. Id. at 551, 592 A.2d 1218. A consent of surety that did not bind the surety to supply the required bonds when the contract was awarded constituted a material, non-waivable defect in the bid. De Sapio Constr. Inc. v. Tp. of Clinton, 276 N.J.Super. 216, 220-22, 647 A.2d 878 (Law Div.1994).
Furthermore, the bid bond with the blank amount and the consent of surety naming the wrong principal were material, non-waivable defects that should have rendered Horan's bid defective. The June 2, 1987, letter from UASCO, apparently intended as a substitute for a surety's certificate, did not cure the defect because (1) it was submitted after the bids were opened; (2) UASCO was not licensed in New Jersey or listed on the required Treasury Circular; and (3) it did not bind the surety; instead, UASCO disclaimed liability.
The UASCO performance and labor and material bonds were also issued by an unlicenced and unlisted surety, and the Fidelity & Deposit bonds were fraudulent. These defects should have rendered the Horan contract void.
*19 The trial judge treated Pollack's letters as improper legal advice that did not indicate that he had knowledge of the criminal enterprise. In Smith v. Berg, 247 F.3d 532, 538 n. 11 (3d Cir.2001), the court considering a RICO conspiracy addressed a similar contention. There, the court rejected the argument that those who "merely provide services" should not be liable. The court explained that "liability will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity. If the Appellants' repeated characterization of themselves as innocent service providers is not belied by the evidence, they will incur no liability...." Ibid.
Pollack will incur no liability if the jury finds that his incorrect legal opinions were unknowing and innocent. However, Pollack's advice was so egregiously wrong that a jury could find that it surpassed negligence or recklessness, and it could infer knowledge of the bid-rigging scheme and intent to participate in it.
Pollack certified that, when he rendered his June 2 opinion, he did not know that the Horan bid did not include a consent of surety or that the bid bond's price was blank, in violation of the contract specifications. Yet he stated in his June 2 letter that he reviewed "all the bid documents." Legal expertise was not required to ascertain that a mandated document, the consent of surety, was missing, and that a price in the bid bond was blank. A cursory review of the documents would have revealed these obvious deficiencies.
Pollack certified that he did not know that UASCO, the surety that issued the bonds, was not licensed in New Jersey or listed on Treasury Circular 570, as required by the bid specifications. He admitted that he made no effort to ascertain whether the bonds complied with these specifications before he opined that they did comply. A jury could conclude that his failure to conduct any investigation, in violation of his professional obligation to investigate, surpassed mere negligence or recklessness, and indicated an intentional participation in the scheme to award the contract to Horan.
Pollack admitted that Maione informed him that the Fidelity & Deposit bonds were fraudulent. Maione said that she informed Pollack both by letter and telephone on March 2, 1988. Pollack failed to take any action. Subsequently, on July 17, 1989, Pollack rendered an opinion that the "Performance Bonds are valid," apparently referring to both the UASCO and Fidelity & Deposit performance bonds. This was more than improper legal advice; Pollack concealed the fact that the Fidelity & Deposit bond was fraudulent by rendering an opinion that it was valid. It is reasonably inferrable that this concealment was intentional and Pollack was participating in a plan to insure that Horan retained the contract.
Pollack's two opinion letters, if intentionally false, and failure to take any action after ascertaining that Fidelity & Deposit bonds were fraudulent, could have constituted violations of N.J.S.A. 2C:21, and thus qualified as racketeering under N.J.S.A. 2C:41-1(1)(o).
Issuing the false opinion letters and failure to act might have been a breach of Pollack's duty as a lawyer, if Pollack solicited or accepted a benefit in return for issuing them. N.J.S.A. 2C:21-10(a).
Failure to disclose the fraudulent bonds might have constituted falsifying records, if Pollack concealed a writing or record, "knowing that it contains a false statement or information, with purpose to deceive or injure anyone or to conceal any wrongdoing." N.J.S.A. 2C:21-4(a).
*20 Issuing the false opinion letters and failure to act might also have constituted official misconduct, refraining from performing Pollack's legal duty in order to obtain a benefit for himself or another. N.J.S.A. 2C:30-2.
The two opinion letters could qualify as a pattern of racketeering because they embraced criminal conduct and were interrelated, both pertaining to the bonds submitted by Horan on the same project. N.J.S.A. 2C:41-1(2)(d). A jury could find that Pollack was associated with the bid-rigging enterprise and knowingly engaged in activities that helped to effectuate its goals. Ball, supra, 141 N.J. at 162, 661 A.2d 251.
Pollack asserts that he did not remain silent in the face of knowledge that the Fidelity & Deposit bonds were fraudulent; he notes that Pini, Sr., and Kiefer were also advised. However, it was Maione, not Pollack, who told Pini, Sr., and Keifer. Pollack certified only that Keifer and Pini, Sr., "were also advised," not that he advised them. In addition, Maione asserted that Pollack's response was to "wait and see what happens" and "[l]et it sit," rather than take action.
Pollack emphasizes that the "known conspirators" did not implicate him. This is correct, but it does not compel the conclusion that Pollack had no knowledge of the bid-rigging scheme and did not intentionally participate in it. A jury might credit the testimony of the criminals, but the evidence is not so one-sided that Pollack must prevail as a matter of law. Brill, supra, 142 N.J. at 540, 666 A.2d 146.
It is ordinarily improper to grant summary judgment when a party's state of mind is in issue. In Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 290-92, 544 A.2d 377 (1988), the Court reversed a summary judgment when the issue was whether plaintiff had waived his claims; the Court reasoned that whether plaintiff intended a waiver was a genuine fact issue. In Garden State Bldgs. v. First Fid. Bank, 305 N.J.Super. 510, 527, 702 A.2d 1315 (App. Div., 1997), certif. denied, 153 N.J. 50, 707 A.2d 153 (1998), this court commented: "Questions of waiver are normally questions of intent and hence should not be decided on a summary judgment motion." In G & W, Inc. v. Bor. of E. Rutherford, 280 N.J.Super. 507, 514, 656 A.2d 11 (App. Div.1995), an anti-trust case, we said that summary judgment was not appropriate because motive and intent were in issue. In Duerlein v. N.J. Auto. Full Ins. Underwriting Ass'n, 261 N.J.Super. 634, 642, 619 A.2d 664 (App.Div.1993), an insurance case, this court concluded that the trial judge erred in "summarily conclud[ing] that [the defendant-insurance company] was guilty of bad faith."
So too here. The trial judge mistakenly granted summary judgment when Pollack's state of mind, his knowledge of the bid-rigging scheme and intent to participate in it, was in issue.

III.
18 U.S.C.A. § 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity...."
Under 18 U.S.C.A. § 1961(1)(B), "racketeering activity" includes mail fraud, prohibited under 18 U.S.C.A. § 1341. A pattern of racketeering "requires at least two acts of racketeering activity." 18 U.S.C.A. § 1961(5). The factor of "continuity plus relationship" between the two acts "combines to produce a pattern." *21 H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L. Ed.2d 195, 208 (1989). Plaintiff contends that Pollack used the mail for fraudulent purposes, which constituted a pattern of racketeering activity.
Under USRICO, an "enterprise" also includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4).
Under 18 U.S.C.A. § 1962(c), unlike N.J.S.A. 2C:41-2(c), mere participation in the enterprise is insufficient; the actor must "participate in the operation or management of an enterprise through a pattern of racketeering activity." Reves v. Ernst & Young, 507 U.S. 170, 184, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525, 539 (1993) (footnote omitted). The Court explained that "liability is not limited to those with primary responsibility for the enterprise's affairs," but "some part in directing the enterprise's affairs is required." 507 U.S. at 179, 113 S.Ct. at 1170, 122 L.Ed.2d at 537. "[L]ower rung participants in the enterprise" could be involved in its management, and someone who exerts control over an enterprise might also operate or manage it. 507 U.S. at 184, 113 S.Ct. at 1173, 122 L.Ed.2d at 540.
The Eighth Circuit has held that Congress did not intend Section 1962(c) to penalize all who are employed by or associated with a RICO enterprise, but only those, who by virtue of their association or employment, play a part in directing the enterprise's affairs. Handeen v. Lemaire, 112 F.3d 1339, 1348 (8th Cir.1997). An attorney or other professional does not conduct an enterprise's affairs through run-of-the-mill professional services. Ibid. (citing Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir.1994)(finding no RICO liability where defendant had "acted as no more than [an] attorney"); Baumer v. Pachl, 8 F.3d 1341, 1344 (9th Cir.1993) (affirming dismissal of case against attorney whose "role was limited to providing legal services"); University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1538-40 (3d Cir.1993) (holding that accounting firm could not be liable for performing generic financial services for an insurance company); Nolte v. Pearson, 994 F.2d 1311, 1317 (8th Cir.1993) (deeming directed verdict appropriate where plaintiff's evidence did not indicate attorneys participated in the operation or management of the enterprise); Menuskin v. Williams, 940 F.Supp. 1199, 1210 (E.D.Tenn.) (granting summary judgment for attorney who performed "standard, routine" services for construction company), appeal dismissed, 98 F.3d 1342 (6th Cir.1996)). It is only when attorneys actively participate in the conduct of the enterprise, that courts will impose liability under RICO. Id. at 1349.
For example in Handeen there was evidence that the defendants-attorneys not only rendered legal advice but actually "conducted the bankruptcy estate," whose purpose was to fraudulently deprive plaintiff of a civil judgment against the defendant-bankrupt. Id. at 1350. Reversing a summary judgment in favor of defendants-attorneys, the court stated:
Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise.
[Handeen, 112 F.3d at 1349.]
Here, Pollack did not cross that line. Pollack acted in an advisory capacity, possibly in a knowingly fraudulent way. His opinion letters were routine legal services *22 and did not constitute direction of the enterprise's affairs. His concealment of the fact that the Fidelity & Deposit bonds were fraudulent was a component of his legal advice that the bonds were valid and did not evidence management or control over the conduct of the enterprise.
Pollack's rendering legal opinions, together with failing to disclose that the bonds were fraudulent, are not evidence that he directed the affairs of the enterprise. While the services were rendered incompetently and possibly dishonestly this does not impute culpability under Reves.
The trial judge properly granted summary judgment in favor of Pollack on the federal RICO claim.

IV.
Plaintiff contends that the judge erred in dismissing its state and federal RICO conspiracy claims. Plaintiff argues that there was ample evidence that Pollack agreed to participate in the conduct of the bid-rigging enterprise, which included Horan's retention of the illegal public contract. The trial judge did not address this issue.
Under N.J.S.A. 2C:41-2(d), "It shall be unlawful for any person to conspire as defined by [N.J.S.A. 2C:5-2], to violate any of the provisions of this section."
A conspiracy to commit a crime under N.J.S.A. 2C:5-2(a) is an agreement with another person or persons to "engage in conduct which constitutes such crime," or to aid the other person or persons "in the planning or commission of such crime." One of the conspirators must commit "an overt act in pursuance of such conspiracy."
Under 18 U.S.C.A. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."
In Ball, supra, the Court, adopting the federal standard, said that a RICO conspiracy had two elements: an agreement to conduct or participate in the conduct of the affairs of the enterprise, and an agreement to the commission of at least two predicate acts. 141 N.J. at 176, 661 A.2d 251. The Court held that the defendant need not agree to personally commit the two predicate acts; the defendant's agreement that others will commit the acts is sufficient. Id. at 177-81, 661 A.2d 251.
Since the decision in Ball, the United States Supreme Court has ruled that the defendant's agreement to personally commit two overt acts is unnecessary. Salinas v. United States, 522 U.S. 52, 63, 118 S.Ct. 469, 476, 139 L. Ed.2d 352, 365 (1997). The Court explained that the RICO conspiracy provision omitted the requirement of an overt act and was thus "more comprehensive than the general conspiracy offense." 522 U.S. at 63, 118 S.Ct. at 476, 139 L.Ed.2d at 365-66. The Court explained: "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." 522 U.S. at 65, 118 S.Ct. at 477, 139 L.Ed.2d at 367.
Here, even if Pollack was not guilty of racketeering, his issuing the incorrect opinion letters that the bonds were valid was evidence that he adopted the goal of furthering the scheme to illegally obtain and keep the contract for Horan. The bid-rigging plan was a criminal endeavor that included bribery, and Pollack's abuse of his position as counsel to the SMUA indicates that he intended to further this criminal endeavor. Pollack aided the other conspirators in the commission of their crime; by approving the bonds, he ensured that the scheme would remain undetected.
*23 In Smith v. Berg, supra, 247 F.3d at 534, the court rejected the argument that RICO conspiracy liability is "limited to those who would, upon successful completion of the scheme, have participated in the operation or management of a corrupt enterprise." In accordance with Salinas, liability under § 1962(c) is not a prerequisite to liability for conspiracy. 247 F.3d at 537. Thus, Pollack's lack of direction of the affairs of the bid-rigging enterprise does not exculpate him from liability for conspiracy. If his provision of legal services was "innocent," he is not guilty of conspiracy, but a jury could find that his services were "purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." Id. at 538 n. 11.
The trial judge erred in dismissing plaintiff's State and federal RICO conspiracy claims.
Affirmed as to the dismissal of the federal RICO claim. Reversed and remanded for trial on the State RICO claim and the State and federal RICO conspiracy claims.