236 N.J. Super. 388 (1989)
565 A.2d 1133
STOCHASTIC DECISIONS, INC. PLAINTIFF-RESPONDENT,
v.
JAMES DIDOMENICO, CAROL COACHES, INC., ALL AMERICAN COACHES, INC., DCJM REALTY CORP. AND ACJ TRANSPORTATION CORP., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1989.
Decided October 30, 1989.
*390 Before Judges GAULKIN, DREIER and SCALERA.
Frank E. Catalina argued the cause for appellants (Margulies, Wind, Herrington & Katz, attorneys; Frank E. Catalina, on the brief).
Helen Davis Chaitman argued the cause for respondent (Ross & Hardies, attorneys; Helen Davis Chaitman, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendants appeal from a ruling by Judge Garrenger in the Law Division holding all corporate defendants jointly and severally liable for $175,564 in unpaid insurance premiums, and James DiDomenico personally liable for $41,265 in compensatory and $100,000 in punitive damages.
The corporate defendants are part of a group of closely held corporations owned by Anthony and Carol DiDomenico or their son James, the common purpose of which was to provide bus services. Two of the major corporations, the Eagle Bus Company which ran a coach service and the Bravo Bus Corp. which leased the busses to Eagle, are not defendants in this action. Other DiDomenico corporations included: Carol Coaches, Inc., which garaged Eagle's busses; All American Coaches, Inc., which was formed to obtain transport rights for other companies; ACJ Transportation Corp. which ran a school bus service; and PDQ Escorts, Inc., which provided escort service to the busses.
Since 1982, Irwin Yagoda, president of plaintiff Stochastic Decisions, Inc., served as insurance broker for many of the DiDomenico corporations. Although Anthony claimed that Yagoda was aware of the separate purposes and functions of each *391 corporation, Yagoda claimed to be unaware of the responsibilities of each corporation and considered it an ongoing question as to which corporations to insure. Yagoda testified that all the corporations involved in running the bus operation faced potential liability, blanket insurance coverage was necessary, and thus all were listed as named insureds on the policies. When insurance premium payments were made to Yagoda, the money was drawn from whichever DiDomenico corporation could honor the check.
In 1984, Anthony and Carol transferred ownership of Carol Coaches to James. James, upon becoming owner, continued the insurance policy on Carol Coaches that Yagoda had provided. Carol Coaches' property ultimately sold for $2,100,000.
There was a history of delinquent premium payments, and Yagoda had on occasion advanced the funds himself and forwarded payment to the insurance companies. Yagoda and the insurance companies, fearful that Anthony might default, requested financial information from the DiDomenicos. In early 1985, Anthony provided a personal financial statement that falsely reflected his ownership of real estate that belonged to Carol Coaches and his son James. Anthony, Carol and James promised they would sell this land to pay for the premiums, but never did.
In early 1985, the insurance coverage was about to lapse unless the insureds paid $61,000 in audits and adjustments. The DiDomenicos asked Yagoda to forward the adjustment and promised they would pay him back. Yagoda forwarded the adjustment payment, but only after receiving five post-dated checks, signed by James, as part of a repayment schedule. (These checks served as the basis for James' personal liability). Yagoda did not ask for and the repayment schedule did not include personal guarantees or promissory notes from the DiDomenicos. The first post-dated check, a $20,000 check from the ACJ Corp., was to be deposited at the end of the month. This check cleared, and the amount is not in dispute. The *392 difference was to be paid with four additional post-dated checks from the Eagle Corp. These were to be deposited one per week after the end of the month.
Before the first additional post-dated check was to be deposited, the DiDomenicos instructed Yagoda not to deposit these checks. Eventually, on the advice of the DiDomenico's bookkeeper, but not on the authorization of Anthony or James, Yagoda deposited the first check, and it was returned for insufficient funds. Anthony DiDomenico then stopped payment on the rest of the checks because the first was not deposited with his authorization. In 1985, Eagle Bus and Bravo Bus Corp. filed for bankruptcy.[1]
Plaintiff filed a complaint on January 10, 1986, seeking $294,200 plus prejudgment interest against the corporate defendants as well as compensatory damages measured by the four unpaid checks and punitive damages against James. At the time of trial, the DiDomenico Enterprises owed the plaintiff about $175,000 in prepaid premiums. After a bench trial, Judge Garrenger held all the corporate defendants jointly and severally liable based on numerous instances of commingling of assets and misrepresentation regarding their ownership. James DiDomenico was held to be personally liable, in fraud, for the four bad checks. Judge Garrenger believed that James knew the four checks were not going to be honored. He further felt James and Anthony to be totally unbelievable witnesses. Finally, James was held liable for an additional $100,000 in punitive damages. The judge believed that James lied regarding his intent to honor the checks, and transferred corporate assets away while telling Yagoda to hold the checks. There was, however, some language in the opinion indicating that while the judge felt James' actions deserved to be penalized, *393 he was using the punitive damage award to cause Anthony immediately to pay the full amount due.
Defendants claim the trial court erred in piercing the corporate veils and make two major arguments in support of this proposition. First, defendants contend that the corporate defendants maintained a separate existence. They stress that Carol Coaches and DCJM never engaged in the same business as the defunct Eagle or Bravo Bus Corps., i.e., the business of bussing, and that little commingling of assets occurred. Second, they assert that Irwin Yagoda, an experienced and intelligent insurance broker, bore the risk of dealing with Eagle Bus and Anthony DiDomenico. They point out that Yagoda knew of the separate corporate existences (although this testimony is disputed), yet never requested personal guarantees or promissory notes.
Plaintiff correctly notes that the proof demonstrated that Eagle represented itself as "Carol Coaches, Inc. d/b/a Eagle," took tax depreciations for Carol Coaches' assets and paid no rent to Carol Coaches for use of their garage. Further, the respondents call attention to Anthony's testimony that he was likely to pay corporate bills from whichever corporate checking account had the funds at the time.
Judge Garrenger pierced the veils of the corporate defendants after referring to a pervasive commingling of corporate assets and identities. He had no doubt in his mind that "Carol Coaches was holding itself out as one and the same as Eagle" and that Yagoda relied on this representation.
The power of New Jersey courts to pierce the corporate veil is well established. In State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473 (1983), the New Jersey Supreme Court recently stated:
The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, Telis v. Telis, 132 N.J. Eq. 25 (E. & A. 1942), to perpetrate fraud, to accomplish a crime, or otherwise to evade the law, Trachman v. Trugman, 117 N.J. Eq. 167, 170 (Ch. 1934). [Id. 94 N.J. at 500].
*394 New Jersey courts have also pierced the corporate veil of a closely held corporation to impose liability on the owner individually. Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216 (Ch. Div. 1972) (personal liability imposed in the wake of a fraudulent pyramid scheme). Accord, Yacker v. Weiner, 109 N.J. Super. 351 (Ch. Div. 1970), aff'd 114 N.J. Super. 526 (App. Div. 1971). Another New Jersey case held numerous corporations to be part of a family partnership for purposes of forced dissolution. Fortugno v. Hudson Manure Co., 51 N.J. Super. 482 (App.Div. 1958). New Jersey courts will likewise pierce the corporate veil of a subsidiary corporation where it is a mere instrumentality of the parent corporation. Mueller v. Seaboard Commercial Corp., 5 N.J. 28 (1950).
Under facts more analogous to those at bar, the Massachusetts Supreme Court pierced the corporate veils to hold numerous closely held corporations and their owner liable for conversion. My Bread Baking Co. v. Cumberland Farms, Inc. et al., 353 Mass. 614, 233 N.E.2d 748 (1968). The Court stated the general rule that common ownership along with common management will not alone give rise to common liability, but then stated:
[A]dditional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of `closely identified' corporations, a court `need not consider with nicety which of them' ought to be held liable for the act of one corporation `for which the plaintiff deserves payment.' [233 N.E.2d at 752; emphasis supplied].
See also Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10 (1st Cir.1985), which even more strongly supports a finding of liability for the corporate defendants in the case before us. Unlike in My Bread Baking, none of the corporations *395 in Pepsi-Cola Metro. were agents of the others. Further, the corporate defendants in the case at bar commingled funds and operated in each others' names, similar to those defendants in Pepsi-Cola Metro. Furthermore, in Pepsi-Cola Metro. the corporate defendants made impermissible personal payments to their owners, the classic criteria for piercing the corporate veil, similar to the questionable payments or assets transfers to James in the case before us. While in most cases courts have been willing to pierce the corporate veil in the parent-subsidiary context, given the ease with which the individual owners here altered their organizations and closely held assets, there appears to be no reason to limit the application of the rule to parent-subsidiary relationships.
Defendants next urge that plaintiffs never established the prima facie elements of fraud, and that Judge Garrenger erred in failing to grant defendants' motion to dismiss the fraud claim. They further contend that the record is devoid of evidence supporting James' intent to deceive the plaintiffs and that post-dated checks raised no presumption of that intent. Plaintiffs, however, rely on James' signature on the post-dated checks and the trial judge's findings that James knew the checks would not be honored.
The party asserting a fraud bears the burden of proving that fraud. Schmidt v. Schmidt, 220 N.J. Super. 46, 50 (Ch. Div. 1987). Fraud is not presumed; it must be proven through clear and convincing evidence. Albright v. Burns, 206 N.J. Super. 625, 636 (App.Div. 1986). But, the trial judge should not be overruled in his finding if it is supported by substantial and credible evidence. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974).
The elements for actionable legal fraud are: (1) material representation of a present or past fact; (2) made knowing it was false and with the intent that it be relied upon; and (3) detrimental reliance incurred upon the representation. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981). The *396 representation may consist of a present intention to act or not act in the future. Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 457 (App.Div. 1985) ("A promise to pay in the future is fraudulent if there is no present intent ever to do so.") Ibid. This intention may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise. Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 381 (App.Div. 1960). But, mere proof of nonperformance does not prove a lack of intent to perform. Id. at 382.
Given the defendants' conduct in the present case, a finding of fraud was certainly permissible. Judge Garrenger specifically determined that James purposely misled plaintiff by signing the checks that were given to pay the premiums when he knew that the assets to cover the checks were not to be placed in the maker's name.[2]
Lastly, James challenges the punitive damage award. In Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37 (1984), the New Jersey Supreme Court outlined the requirements supporting punitive damages.
To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another. [Id. at 49].
*397 The Court in Nappe stressed the need for a wrongful, intentional act, or a wanton disregard for the rights of another. Nappe further illuminates the requirements for punitive damage awards in the context of a legal fraud action. The Court stated that "it is especially fitting to allow punitive damages for actions such as legal fraud, since intent rather than mere negligence is the requisite state of mind." 97 N.J. at 50.
Here we have a case of legal fraud where, although plaintiff did not make James a general defendant as to all of the corporate acts,[3] the specific claim against James for legal fraud was proven to the satisfaction of the judge. Since he determined that James had defrauded plaintiff in a way that not only prevented the four checks from being paid, but also had kept the assets from the entities that would have been required to pay the other premiums, the court had every right to assess appropriate punitive damages. Only where the record lacks substantial credible evidence may the trial judge's finding be overturned. Rova Farms Resort v. Investors Ins. Co., supra. While Judge Garrenger seemed more outraged by the actions of Anthony than those of James, there is no reason to overturn the punitive award. It is clear from the judge's comments that he would have preferred that Anthony pay the amounts due, and the judge implied that if such payment were immediately forthcoming, he might reconsider the punitive award. This desire to aid plaintiff in its collection efforts in no way impugns the soundness of the judgments against James.[4]
*398 After a long and difficult case, Judge Garrenger rendered a comprehensive and considered opinion. With the further explanation we have made herein, we affirm the judgment against all defendants substantially for the reasons expressed by Judge Garrenger in his oral opinion of May 27, 1988.
NOTES
[1] At oral argument it was explained that proposed or pending bankruptcy proceedings made it inadvisable to join these defendants. The proceedings, however, were terminated without a discharge in bankruptcy.
[2] In this case James made positive statements concerning intentions that to the trial judge appeared untrue when made. We noted earlier James' substantial involvement in the family's bus businesses. Plaintiff additionally stated that the individuals "never made a distinction as to who owned what. They all live in the same house. They all work in the same office." James had been an employee of the Corporation since he was a child, even carried on the books while he was away at school. Yagoda also stated that "I constantly called and I talked to all of them. And James was signing the checks and James was the one who also was running a good part of the business. He was doing everything that his father did."
[3] Just prior to trial plaintiff attempted to amend its complaint and add James as a general party defendant. The court denied the motion, thus James' compensatory liability was limited to the amount of the four checks.
[4] We were informed at oral argument that after additional legal efforts in New York and New Jersey, costing plaintiff tens of thousands of dollars in legal fees, and after being faced with the intermediate transfer or claims of transfer of all substantial property subject to execution, plaintiff was able to isolate and attach sufficient property to pay this judgment in full. Payment, however, has been withheld pending a decision in this case.