**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3169-20

ANY GARMENT UNION, LLC
and ELIZABETH BORBOLLA,

     Plaintiffs-Appellants,

v.

DRY CLEAN EXPRESS I, LLC,
TANYA VASQUEZ, MATSAMY
VASQUEZ, PATRIOT BUSINESS
ADVISORS, LLC, LILIANE
TIETJEN, ANY GARMENT
CLEANERS 2, LLC, CARLOS
MARROQUIN, DRY CLEAN
SERVICES, LLC, SALMON,
RICCHEZZA, SINGER & TURCHI,
LLP, RONALD L. DAUGHERTY,
ESQ., ANY GARMENT
CLEANERS 3, LLC, and CHM
DRY CLEANING SERVICE, LLC,

     Defendants-Respondents,

and

ROCCO P. PERATE and
BENEFICIAL BANK,

     Defendants.

_____

Argued September 29, 2022 – Decided October 27, 2022

Before Judges Sumners, Geiger, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-4367-18.

Michael Confusione argued the cause for appellants (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the briefs).

James Bell argued the cause for respondents Dry Clean Express I, LLC, Tanya Vasquez, Matsamy Vasquez, Patriot Business Advisors, LLC, Liliane Tietjen, Any Garment Cleaners 2, LLC, Carlos Marroquin, Dry Clean Services, LLC, Any Garment Cleaners 3, LLC, and CHM Dry Cleaning Service, LLC, (Bell & Bell LLP, attorneys; James Bell, of counsel and on the brief).

Matthew S. Marrone argued the cause for respondents Salmon, Ricchezza, Singer & Turchi, LLP, and Ronald L. Daugherty, Esq. (Goldberg Segalla, LLP, attorneys; Matthew S. Marrone, of counsel and on the brief).

PER CURIAM

Plaintiffs Any Garment Union LLC (AGU) and Elizabeth Borbolla appeal from Law Division orders that granted summary judgment dismissing their remaining claims against defendants Dry Clean Express I, LLC (DCE I); Tanya

A-3169-20

Vasquez (Tanya)[1]; Matsamy Vasquez (Matsamy); Patriot Business Advisors LLC (PBA); Liliane Tietjen; Any Garment Cleaners 2 LLC (AGC2); Carlos Marroquin; Dry Clean Services LLC (DCS); Any Garment Cleaners 3 LLC (AGC3); CHM Dry Cleaning Service LLC (CHM); Salmon, Ricchezza, Singer & Turchi LLP (SRST); and Ronald L. Daugherty Esq. We affirm in part, reverse in part, and remand for further proceedings and trial.

I.

We glean the following facts from the summary judgment record, viewing them in the light most favorable to the non-moving plaintiffs. See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021).

In February 2018, Borbolla agreed to purchase a dry cleaning and laundry business in Union known as Any Garment Cleaner (the Union store) from its owner, DCE I. DCE I was owned by Matsamy and Tanya. The initial terms of the agreement were set forth in an offer to purchase (OTP) and addendum. Borbolla agreed to remit a $100,000 deposit upon acceptance of the agreement and the balance of $1,900,000 at closing. Paragraph three of the OTP provides:

> In the event the closing does not take place by [April 15, 2018], either party may thereafter terminate this

---

[1] Because two defendants share the same surname, we refer to them by their first names. We intend no disrespect.

agreement unless such party is responsible for the delay. Upon such termination, if the delay was the fault of the Buyer, the deposit shall be forfeited as provided below, otherwise, it shall be returned to the Buyer.

Paragraph nine provides: "The Seller represents and warrants that it has good and marketable title to the Assets being sold, and will satisfy all taxes, payroll, liabilities and obligations of the business at or prior to Closing." Paragraph eleven provides: "Seller shall indemnify and hold harmless Buyer from all claims, liabilities, or obligations arising out of conduct of the Business prior to Closing." Paragraph fourteen provides: "Both Buyer and Seller agree that any information provided by Broker has not been verified by Broker and both parties shall rely solely on their own due diligence and hold Broker harmless from all claims regarding this transaction." Paragraph fifteen provides:

Buyer agrees that if it should fail or refuse to complete this transaction within fourteen days after the Closing date [April 15, 2018,] unless amended in writing, then any funds on Deposit with the Broker will be forfeited without notice, and, at the Broker's option, shall be split 50% to the Seller, and 50% to the Broker."

The addendum states: "A Definitive Purchase Offer, incorporating the terms of this Offer to Purchase, shall be agreed to by the Buyer and the Seller. Both parties shall work cooperatively and expeditiously to complete such Definitive Purchase Offer." The addendum sets forth seven contingencies,

which include "review and approval of financials" and "SBA financing approval at acceptable terms."  It also states that the "contingencies shall expire and the Deposit shall become non-refundable without notice to the Buyer at [3:00 p.m.] on [April 1, 2018].  The Deposit shall be refunded to the Buyer upon Buyer's notification to the Seller in writing, via Broker, prior to said date, that the Buyer is canceling this Offer."

PBA served as the broker for the transaction.  Tietjen was a principal and agent of PBA.  PBA and Tietjen also served as agents of defendants and as escrow agents for various other transactions involving defendants and their affiliates.

SRST is a law firm that represented defendants in related litigation and transactions.  Daugherty is an attorney at SRST.  Defendant Rocco P. Perate is an attorney and employee of defendant Beneficial Bank.  While this appeal was pending, plaintiffs dismissed their claims against Perate and Beneficial Bank with prejudice.

Borbolla remitted the $100,000 deposit, which was to be held in escrow pending closing.  PBA and Tietjen served as the escrow agents.  The deadline for closing was extended several times.

A-3169-20

Borbolla subsequently formed AGU and signed an asset purchase agreement (APA) on behalf of AGU with DCE I that reaffirmed the essential terms of the transaction outlined in the OTP, added additional terms, and set July 27, 2018, as the tentative closing date. The APA states it is a valid and binding agreement that "supersedes all prior agreements and understandings." It also specifically addresses the $100,000 deposit, placing it in escrow.

Plaintiffs engaged in due diligence. Title and judgment searches revealed liens and encumbrances affecting the marketability of title of the Union store and real estate. In addition, investigation revealed a fraudulent conveyance lawsuit involving the property on which the Union store is located. As a result, the sale did not close, and the seller terminated the contract on September 27, 2018.

More specifically, a judgment search uncovered liens against CHM, the former owner of the Union store. CHM sold the Union store to DCE I on January 15, 2015. The stated consideration for that transfer was the assumption by DCE I of $1,053,000 in secured debt. At the time of the sale, DCE I also executed a $1,361,132 consulting agreement with CHM's owner, Marroquin. Marroquin is the brother of DCE I's owner, Matsamy.

A-3169-20

Two judgments against CHM were uncovered. On July 2, 2015, the Division of Employer Accounts obtained judgment against CHM for $20,606. On May 5, 2016, the United States of America obtained judgment against CHM for $180,609. In addition, UCC financing statements were filed against CHM's assets on November 17, 2006, March 19, 2013, and March 26, 2013.

The searches also uncovered six judgments against Marroquin. On April 8, 2009, September 10, 2013, and August 23, 2017, the United States of America obtained judgments of $52,646, $62,697, and $27,691 against Marroquin. On September 19, 2013, the Division of Taxation obtained judgment against Marroquin for $29,390. On September 19, 2014, Blinds to Go obtained a judgment against Marroquin for $911,413. Finally, on January 19, 2015, Green Lago, LLC (Green Lago) obtained judgment against Marroquin for $542,250, which was docketed on February 24, 2015.

The Green Lago judgment arose from Marroquin's failure to pay a promissory note. On November 17, 2017, after still not being paid, Green Lago filed a complaint, alleging that Marroquin and CHM's 2015 transfer of the Union store to DCE I "was totally without adequate consideration and was made with the intent and purpose to hinder, delay and defraud [Green Lago] from the collection of the indebtedness owed by Marroquin." The complaint sought to

7

void the conveyance as a fraudulent transfer. On July 26, 2018, a writ of execution was issued against DCE I. On May 20, 2019, the Law Division updated the writ of execution issued against Marroquin to account for post-judgment interest. The amount then owed, including interest, was $931,881. The court also ordered that DCE I "remit payment . . . owed to . . . Marroquin under [the c]onsulting [a]greement . . . in an amount of no less than $931,881." The full balance owed under the consulting agreement as of the court order was $1,065,000. Finally, the court ordered that "in the event [DCE I] . . . sell[s] the Union dry cleaning business, the balance owed on the [Green Lago] judgment at that time shall be paid from the closing proceeds."

During the Green Lago dispute, notices of federal tax liens were sent to Marroquin in the amount of $27,691 and $108,072, respectively.

Plaintiffs' concerns regarding the marketability of title resulted in the closing date being mutually extended multiple times. Plaintiffs' counsel sought clarification "regarding the liens and judgments against [Marroquin] and CHM." DCE I's counsel, Daugherty, replied by stating that the request was "ridiculous." Daugherty maintained "[t]he equipment and business ha[d] no liens on them," and that "Marroquin ha[d] nothing to do with th[e] sale." In his opinion, "there [were] no risks." The parties could not resolve the issue, and on September 27,

2018, Daugherty sent a letter terminating the agreement because of plaintiffs' failure to close.

On October 18, 2018, plaintiffs' counsel contacted Tietjen, demanding return of the $100,000 deposit. Tietjen responded that at DCE I's request, "the funds were released."

On December 27, 2018, plaintiffs filed this action against defendants to recover the deposit and for other relief. The complaint alleged breach of contract against DCE I, Matsamy, Tanya, PBA, and Tietjen. It also asserted causes of action under the New Jersey Racketeer Influenced and Corrupt Organizations Act (RICO), N.J.S.A. 2C:41-1 to -6.2, civil conspiracy to commit fraud, aiding and abetting fraud, unjust enrichment, and constructive trust against all defendants. Lastly, it alleged breach of escrow and conversion against PBA and Tietjen.

Defendants moved to dismiss plaintiffs' claims for failure to state a claim upon which relief could be granted pursuant to Rule 4:6-2(e). On July 5, 2019, the court denied the motion in its entirety as to DCE I, Matsamy, Tanya, PBA, Tietjen, CHM, SRST, and Daugherty.[2] The court granted the motion in part, dismissing the claims against AGC 2, AGC 3, and DCS for violating RICO, civil

---

[2] The record does not reveal any ruling as to Marroquin.

conspiracy to commit fraud, and aiding and abetting fraud, without prejudice. Plaintiffs do not appeal from those rulings.

Defendants, except Marroquin, filed answers. Following discovery, defendants moved for summary judgment. Trial was scheduled for May 17, 2021. SRST and Daugherty's motion was returnable on May 14, 2021. The other defendants' motions were returnable on May 28, 2021. Plaintiffs opposed the motions as untimely because they were returnable less than thirty days before the scheduled trial date in violation of Rule 4:46-1. Plaintiffs asserted that defendants did not establish good cause to excuse the late filings.

Substantively, plaintiffs asserted that searches revealed outstanding judgments, pending litigation, and unpaid taxes affected the marketability of title. Plaintiffs argued their concerns regarding the marketability of title were legitimate. Plaintiffs maintained that while "either side" could terminate the transaction if closing did not occur on time, the APA was "quite clear" that plaintiffs' deposit would not be forfeited under these circumstances. Plaintiffs alleged that DCE I, Matsamy, Tanya, PBA, and Tietjen "totally disregarded" the terms of the APA. Plaintiffs also alleged that Daugherty represented DCE I, Matsamy, Tanya, CHM, and Marroquin in Green Lago's fraudulent transfer

lawsuit and other cases, knew about, and was "concealing," the docketed judgments, UCC financing statements, tax liens, and contested title.

Defendants argued that the deposit was non-refundable because plaintiffs had failed to close by the OTP's July 6, 2018 deadline. Defendants contended that even if the APA was controlling, plaintiffs' deposit was forfeited pursuant to the APA's terms. Defendants specifically cited to Section 10.1.2 of the APA. Defendants also stated that none of the liens that were discovered impacted the assets plaintiffs were purchasing.

As to specific parties, defendants argued that AGC 2, AGC 3, DCS, CHM, and Marroquin "ha[d] nothing to do with the failed Union [store] sale." They also argued that "Daugherty never had possession or control over th[e] deposit, [and] never instructed anybody to do anything with [it]." Defendants also pointed out that Daugherty was not a party to the contract, but merely a representative of his client. Finally, defendants argued the claims against Matsamy, Tanya, and Tietjen must be dismissed because they were involved only through their corporate entities, not in an individual capacity.

Following oral argument on May 14 and May 28, 2021, the trial court issued oral decisions and orders that rejected plaintiffs' procedural and

substantive arguments and granted summary judgment to defendants, dismissing plaintiffs' remaining claims.

Regarding the timing of the motions, the court noted that while virtual trials were being conducted, this action did not lend itself to a virtual format, and the case would not be tried "in the near future."

As to SRST and Daugherty, the court stated:

> [Daugherty's] responsibility in this transaction was to draft . . . an asset purchase agreement regarding the business. And that's what he did and that was the beginning and the end of his involvement in this matter. He never took the deposit . . . and he said he didn't represent these other parties in these other transactions.

In relation to the remaining defendants, the court stated that forfeiture of the deposit was proper, and therefore, plaintiffs' claims must be dismissed. The court reasoned that the APA superseded only "prior agreements between the seller and the purchaser." The OTP identified DCE I and Borbolla as the seller and purchaser, while the APA identified DCE I and AGU as the seller and purchaser. Because the purchasers were different in the two agreements, the court reasoned that the OTP was not a "prior agreement[] between the purchaser and seller." Therefore, the APA did not supersede the OTP.

The court reasoned that even if Borbolla signed the APA, she paid the deposit pursuant to the OTP, "which specifically states [that it] is a legal, binding

document [and] [e]ven if that statement was not included in the [OTP], the document satisfies the requirement[s] of [a] legally, binding document." The court found the OTP was enforceable and the deposit became non-refundable when the sale did not close by July 6, 2018.[3] The court noted that it had not been shown any documents suggesting that DCE I was not "ready, able and willing" to fulfill the agreement.

The court found the "heart" of plaintiffs' action was "a breach of contract allegation." It noted that "[w]hile performing due diligence" plaintiffs' attorney "noticed what he believed were certain financial irregularities." Because it found there was no breach of contract, the court concluded it was "hard . . . to find that there would be any of these other causes of action." According to the court, there "can't be a conversion of the money if it was forfeited pursuant to the agreement." The court also found there was no unjust enrichment if there was no breach of contract since there was no wrongful taking of plaintiffs' money. The court further found that "without a breach of contract the fraud and the RICO [claims] are also completely defeated."

---

[3] Contrary to the trial court's finding, the September 27, 2018 termination letter states the termination is due to the buyer's failure to close on September 24, 2018.

This appeal followed. Plaintiffs raise the following points for our consideration:

POINT ONE

THE TRIAL COURT SHOULD HAVE DENIED THE SUMMARY JUDGMENT MOTIONS AS UNTIMELY.

POINT TWO

THE EVIDENCE SUBMITTED ON SUMMARY JUDGMENT WAS SUFFICIENT TO PERMIT A REASONABLE JURY TO FIND IN PLAINTIFFS' FAVOR.

II.

Rule 4:46-2(c) provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). Summary judgment "should ordinarily not be granted where an action or defense requires determination of a state of mind or intent, such as claims of waiver, bad faith, fraud or duress." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.3.4 on R. 4:46-2 (2023); see also Auto Lenders v. Gentilini Ford, 181 N.J. 245, 271-72 (2004).

Appellate courts review the trial court's grant or denial of a motion for summary judgment de novo, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73 (2022). We afford no deference to the trial court's legal conclusions.

We first address the timing of the motions. Rule 4:46-1 states that "motions for summary judgment shall be returnable no later than [thirty] days before the scheduled trial date, unless the court otherwise orders for good cause

shown . . . ." Here, the motions were not timely filed as they were returnable three days before and eleven days after the scheduled trial date, respectively. While the court did not expressly find good cause allowing the late filings, that finding was implicit in its ruling.

The trial date was clearly affected by the impact of the COVID pandemic. The trial court found that the trial would not go forward on the scheduled trial date or soon thereafter given its complexity. The number of defendants and causes of action did not lend themselves to a virtual trial. We concur. This case would not have been tried until long after the scheduled trial date. Moreover, defendants provided the twenty-eight-days' notice required by Rule 4:46-1. Plaintiffs do not claim that they suffered additional costs due to the late filings. Accordingly, they were not prejudiced by the untimely filings. We discern no abuse of discretion in considering the merits of the motions.

Turning to the merits of the summary judgment motions, we reiterate that the trial court found plaintiffs' remaining claims must be dismissed because the deposit was nonrefundable under the terms of the OTP. The court determined that the APA superseded only "prior agreements between the seller and the purchaser." The OTP identified DCE I as the seller and Borbolla as the purchaser, while the APA identified DCE I as the seller and AGU as the

16

purchaser. On that basis, the court reasoned that the OTP was not a "prior agreement[] between the purchaser and seller." Therefore, the APA did not supersede it. The court went on to state that even though Borbolla signed the APA, she paid the deposit pursuant to the OTP, which was a "legally binding document." Accordingly, the deposit became non-refundable on the OTP's July 6, 2018 closing deadline.

For the following reasons, we disagree in large part with the court's findings, analysis, and decision. For purposes of clarity, we address each cause of action separately.

The Governing Contract

We first address whether the OTP or APA governs the transaction. "[C]ourts should interpret a contract considering 'the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" Lederman v. Prudential Life Ins. Co. of Am., 385 N.J. Super. 324, 340 (App. Div. 2006) (alteration in original) (quoting Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 774 (D.N.J. 1999)). Intent is not defined by the subjective expectations of the parties. Ibid. It is "revealed by the language [of the contract]." Globe Motor, 225 N.J. at 483. "[W]ords and phrases are not to be isolated but [instead should be] related to the context and

the contractual scheme as a whole . . . ." Republic Bus. Credit Corp. v. Camhe-Marcille, 381 N.J. Super. 563, 569 (App. Div. 2005) (quoting Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956)); see also Lederman, 385 N.J. Super. at 339 ("[T]he intention of the parties to [a] contract [is] revealed by the [contractual] language . . . taken as an entirety." (quoting Biovail, 49 F. Supp. 2d at 774)).

With these guiding principles in mind, we conclude that the APA superseded the OTP. First, the language of the OTP itself contemplated a subsequent agreement when stating that a definitive purchase order still needed to be executed. The parties then executed the anticipated definitive purchase order, i.e., the APA, which provided that it "embodie[d] the entire agreement and understanding, and supersedes all prior agreements and understandings[] between the [s]eller and the [p]urchaser relating to the subject matter hereof." These contractual provisions reflect a clear intent for the APA to be controlling.

The fact that the OTP listed the purchaser as Borbolla and the APA listed the purchaser as AGU does not alter this conclusion. In both agreements, the property, purchase price, deposit, and seller were the same. Moreover, at the time that the OTP was signed, AGU did not exist yet. Borbolla formed it afterward to finalize the transaction. She is the sole owner of AGU, and signed

18

the APA in that capacity. Under these circumstances, it is abundantly clear that the OTP and APA governed the same transaction between the same parties at different times. Upon its execution, the APA superseded the OTP and governed the transaction.

Breach of Contract

"To establish a claim for breach of contract, a plaintiff must provide proof of 'a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the claimant to sustain[] damages.'" Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 342 (App. Div. 2021) (quoting EnviroFinance Grp., LLC v. Env't Barrier Co., 440 N.J. Super. 325, 345 (App. Div. 2015)). Generally, "the construction of a contract is a question of law" and therefore "[t]he interpretation of a contract is subject to de novo review by an appellate court." Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011) (quoting Jennings v. Pinto, 5 N.J. 562, 569-70 (1950)). "Accordingly, we pay no special deference to [a] trial court's interpretation and look at the contract with fresh eyes." Id. at 223.

We recognize that generally, "[a]n issue regarding interpretation of a contract clause presents a purely legal question that it is particularly suitable for decision on a motion for summary judgment." Pressler & Verniero, cmt. 5 on

19

R. 4:46-2. However, when deciding legal issues, the trial court "cannot grant summary judgment where material facts are in dispute." Driscoll Constr. Co. v. State, Dep't of Transp., 371 N.J. Super. 304, 314 (App. Div. 2004).

Plaintiffs assert breach of contract against DCE I, Matsamy, Tanya, PBA, and Tietjen. As an initial matter, the trial court correctly dismissed the breach of contract claims against PBA and Tietjen. Neither were parties to the OTP or APA. In contrast, DCE I was the identified seller in both the OTP and APA. Matsamy signed the OTP and Matsamy and Tanya signed the APA on behalf of DCE I.

Defendants argue if the APA controls, plaintiffs' deposit was forfeited pursuant to Section 10.1.2 of the APA, which provides the agreement "may be terminated . . . [b]y the [s]eller if there has been a breach of any covenant, representation [or] warranty of the [p]urchaser, provided that the [s]eller shall give written notice of such breach and such breach shall not be cured within ten (10) days of the notice." In turn, Section 12.1.3 states "[i]n the event that . . . this [a]greement is terminated in accordance with Section 10.1.2 by reason of a default by [p]urchaser . . . the [e]scrow [a]gent shall deliver the [d]eposit [m]onies to [s]eller."

Defendants have not demonstrated that plaintiffs breached any "covenant, representation [or] warranty" of the APA. Rather, defendants have asserted that plaintiffs "refused to close." This basis for termination is governed Section 10.1.4, not Section 10.1.2. Section 10.1.4 provides that "either party" can terminate the agreement in the event closing does not occur by the stated deadline. Section 10.2 then states that "[i]n the event that this [a]greement shall be terminated [] in accordance with Section 10.1.1 or 10.1.4 . . . [p]urchaser shall receive the immediate return of the [d]eposit [m]onies." If the agreement is breached by the failure to return the deposit, Section 10.2 states "the non-breaching party may pursue all remedies available to it in law and equity." Since the sale did not close because of the unresolved marketability of title issues, and not due to any breach by the buyer, these sections required the deposit monies to be returned to the buyer. Accordingly, plaintiffs had the right to pursue their claim to the deposit.

Matsamy and Tanya argue they were involved in the transaction through the LLC, not in an individual capacity. They contend that the breach of contract claim is viable only against the LLC.

Generally, the debts, obligations, and liabilities of a limited liability company are not the debts, obligations, and liabilities of its members or

managers. N.J.S.A. 42:2C-30(a). Nevertheless, the power to look beyond the corporate form is well established. Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 393 (App. Div. 1989). Piercing the corporate veil is an equitable remedy whereby "the protections of corporate formation" are forfeited. Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 199 (App. Div. 2006). "[T]he purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." Richard A. Pulaski Const. Co., Inc. v. Air Frame Hangars, Inc., 195 N.J. 457, 472 (2008) (quoting State, Dept. of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983)).

"The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form." Verni, 387 N.J. Super. at 199. Before piercing the corporate veil, "evidence must first establish an independent basis to hold the corporation liable." Sean Wood, L.L.C. v. Hegarty Group, Inc., 422 N.J. Super. 500, 518 (App. Div. 2011). Failure to observe formalities is a significant factor in determining whether to pierce a corporation's veil. See, e.g., Canter v. Lakewood of

<u>Voorhees</u>, 420 N.J. Super. 508, 519 (App. Div. 2011) (discussing failure to observe corporate formalities).

A different standard applies to limited liability companies. N.J.S.A. 42:2C-30 provides that "[t]he failure of a limited liability company to observe any particular formalities relating to the exercise of its powers or management of its activities is not a ground for imposing liability on the members or managers for the debts, obligations, or other liabilities of the company." Nevertheless, personal liability of a member or manager of a limited liability company can be established where extraordinary circumstances, such as fraud or injustice, warrant piercing the corporate veil.

In addition to alleging that Matsamy and Tanya breached the contract, plaintiffs claim Matsamy and Tanya engaged in civil conspiracy to commit fraud and aiding and abetting fraud. To establish a claim of actionable fraud, "a plaintiff must demonstrate that: (1) defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material, and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission to its detriment." <u>Zorba Contractors, Inc. v. Hous. Auth.</u>, 362 N.J. Super. 124, 139 (App. Div. 2003) (quoting <u>Varacallo v. Mass. Mut. Life Ins. Co.</u>, 332 N.J. Super.

31, 43 (App. Div. 2000)). "The representation may consist of a present intention to act or not act in the future." Stochastic, 236 N.J. Super. at 395-96. "This intention may be derived from circumstantial evidence." Id. at 396.

There are genuine issues of material fact in dispute with respect to these claims that preclude summary judgment. In 2015, Green Lago obtained judgment against Marroquin for $542,250. The judgment remained unpaid, and in 2017, Green Lago filed a complaint to set aside CHM and Marroquin's allegedly fraudulent transfer of the Union store to DCE I. Matsamy and Tanya were both named as defendants in that action, and Matsamy was deposed. These facts were not disclosed to plaintiffs. Defendants assert that the Green Lago litigation did not "threaten[] the assets being sold under the 2018 asset purchase agreement." However, on May 20, 2019, the Law Division entered an order in aid of Green Lago's collection efforts, which required DCE I to "remit payment . . . owed to . . . Marroquin" under the parties' consulting agreement and stated that in the event DCE I "sell[s] the Union dry cleaning business, the balance owed on the [Green Lago] judgment at that time shall be paid from the closing proceeds." The order also updated the amount due on the judgment to $931,881 to account for interest. Several other sizable judgments against CHM and

24

Marroquin were not disclosed, which could also impact marketability of the Union store.

Additionally, UCC financing statements were filed against CHM's assets. The financing statements potentially encumbered the Union store's assets, which were part of the sale. See N.J.S.A. 12A:9-310(a) (providing a financing statement is used "to perfect [a] security interest"). Finally, there were sizable outstanding federal and state tax liens against CHM and Marroquin, which potentially affect the Union store's assets. See 26 U.S.C. § 6321 ("If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."); see also N.J.S.A. 54:44-2 ("[A New Jersey tax] debt . . . shall be a lien[4] on all the property of the debtor."). Plaintiffs allege defendants, through counsel, steadfastly refused to provide information or clarification about the liens upon request.

Whether Matsamy and Tanya knew about and concealed these tax liens is unclear, but there is sufficient evidence in the record to raise a factual dispute

---

[4]  N.J.S.A. 54:44-2 further states that the lien is not enforceable against an "innocent purchaser for value in the usual course of business." Whether Borbolla would have qualified as such a purchaser is not relevant here. Viewed in the light most favorable to plaintiffs, the tax judgment was undisclosed, and defendants refused to provide related information or clarification upon request.

for trial. Matsamy and Tanya knew about the Green Lago litigation but did not disclose it.

In conclusion, the record contains evidence that DCE I may be liable for breach of contract. The record also contains circumstantial evidence that Matsamy and Tanya may have participated in a fraud against the buyer, thereby providing a potential basis to pierce the corporate veil and impose individual liability upon them. Since there are material facts in dispute and Matsamy and Tanya have not shown they are entitled to judgment as a matter of law, summary judgment should not have been granted to them dismissing the fraud-based claims.

Breach of Escrow

Plaintiffs assert a breach of escrow claim against PBA and Tietjen. "A fiduciary relationship is created by and inherent in the nature of an escrow agreement." Innes v. Marzano-Lesnevich, 224 N.J. 584, 598 (2016) (quoting Colegrove v. Behrle, 63 N.J. Super. 356, 366 (App. Div. 1960)). "An escrow agreement imports a legal obligation on the part of the [escrow agent] to retain [] money or documents until the performance of a condition or the happening of an event, at which time the money or documents are to be delivered in accordance with the terms of the agreement." Colegrove, 63 N.J. Super. at 365.

"[L]iability attaches to [an escrow agent] if he improperly parts with his deposit." Cooper v. Bergton, 18 N.J. Super. 272, 277 (App. Div. 1952).

Here, even assuming DCE I was entitled to the deposit under Sections 10.1.2 and 12.1.3, the escrow agreement provides:

> Notwithstanding [Sections 10.1.2 and 12.1.3] . . . the [e]scrow [a]gent shall not make delivery of the [d]eposit monies . . . unless it has first received the written approval of both parties hereto. If any controversy should arise among the parties to this Agreement . . . [e]scrow [a]gent shall not be required to determine the same . . . but rather [e]scrow agent shall await the settlement or resolution of any such controversy by final, appropriate legal proceedings.

By immediately releasing the $100,000 security deposit upon the seller's request, PBA and Tietjen may have breached this provision. Moreover, there is evidence suggesting that Tietjen should not be protected by PBA's corporate status. As stated above, piercing the corporate veil can be established through a showing of fraud. Here, Tietjen represented that she would hold the escrow funds according to the terms of the APA and would be neutral in that role. There are material facts in dispute as to whether this representation was false, intentional, and detrimentally relied upon.

Tietjen is the principal of PBA and has a direct financial stake in the business. The OTP provided PBA would keep fifty percent of the deposit if it

was forfeited, and plaintiffs allege this division of funds occurred. Moreover, Tietjen's deposition in the Green Lago litigation indicated she has known Marroquin since 2006, and has brokered multiple deals on his and Matsamy's behalf. This relationship places material facts in dispute as to whether Tietjen disregarded the APA's clear terms to benefit herself and her clients. This arguably rendered her previous representation of neutrality intentionally false. See Stochastic, 236 N.J. Super. at 395 (stating that the intent to make a fraudulent representation "may be derived from circumstantial evidence"). Given these disputed material facts, Tietjen should not have been released from personal liability.

Conversion

Plaintiffs allege PBA and Tietjen converted the deposit monies. "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Meisels v. Fox Rothschild LLP, 240 N.J. 286, 304 (2020) (quoting Chi. Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 456 (App. Div. 2009)). "[C]onversion applies to money, provided that 'the money ha[s] belonged to the injured party and that it be identifiable." Ibid. (quoting Ellis, 409 N.J. Super. at 455-56).

A-3169-20

PBA and Tietjen may have violated Section 12.1.4 of the APA by releasing plaintiffs' deposit before there was "resolution of [the] controversy by final, appropriate legal proceedings." There are disputed facts as to whether the deposit should have been returned to plaintiffs pursuant to Sections 10.4.1 and 10.2. Because PBA and Tietjen's actions may have deprived plaintiffs of their contested right to these funds, the conversion claims against PBA and Tietjen should not have been dismissed.

Constructive Trust

Plaintiffs seek imposition of a constructive trust against all defendants. "A constructive trust is a remedial device through which the 'conscience of equity' is expressed." Thompson v. City of Atl. City, 386 N.J. Super. 359, 375 (App. Div. 2006). It is imposed "when a person has acquired possession of or title to property under circumstances which, in good conscience, will not allow the property's retention." Id. at 375-76. "[A] court must find that a 'wrongful act' caused the property to come into the hands of the recipient and that the recipient will be 'unjustly enriched' if it is not returned." Id. at 376 (quoting Flanigan v. Munson, 175 N.J. 597, 608 (2003)). "In that circumstance, the court of equity converts the recipient into a trustee and requires that he account for the res in whatever manner the court deems fair and just." Ibid.

29

Plaintiffs do not allege that CHM, Marroquin, SRST, Daugherty, AGC 2, AGC 3, or DCS ever took possession of the deposit. Consequently, there are no material facts in dispute precluding summary judgment as to these defendants. However, the trial court incorrectly dismissed the constructive trust claim as to DCE I, Matsamy, Tanya, PBA, and Tietjen. There are sufficient material facts in dispute as to whether these defendants committed a wrongful act by taking the deposit and were unjustly enriched by keeping it. On remand, the court shall consider whether a constructive trust should be imposed against DCE I, Matsamy, Tanya, PBA, and Tietjen.

Unjust Enrichment

Plaintiffs allege unjust enrichment against all defendants. "The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Goldsmith v. Camden Cnty. Surrogate's Off., 408 N.J. Super. 376, 382 (App. Div. 2009) (quoting Assocs. Com. Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986)). "To establish a claim for unjust enrichment, 'a [party] must [demonstrate] both that [the opposing party] received a benefit and that retention of that benefit . . . would be unjust.'" Iliadis v. Wal-Mart Stores, Inc., 191 N.J.

88, 110 (2007) (quoting <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994)).

Again, CHM, Marroquin, SRST, Daugherty, AGC 2, AGC 3, and DCS never took possession of the deposit. Consequently, the claim of unjust enrichment fails against them. In relation to DCE I, Matsamy, Tanya, PBA, and Tietjen, however, we are conclude there are material facts in dispute as to whether these defendants were unjustly enriched by retaining the deposit. satisfied that the events fit squarely within the doctrine of unjust enrichment. <u>See</u> <u>Kutzin v. Pirnie</u>, 124 N.J. 500, 518 (1991) (discussing whether retaining a deposit unjustly enriched the defendants).

<u>Civil Conspiracy to Commit Fraud</u>

Plaintiffs alleged civil conspiracy to commit fraud against all defendants. The trial court dismissed the claim as to AGC 2, AGC 3, and DCS. A civil conspiracy occurs when "two or more persons act[] in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." <u>Banco Popular North America v. Gandi</u>, 184 N.J. 161, 177 (2005).

Because civil conspiracy requires "an underlying wrong," we have recognized that a claim of civil conspiracy to commit fraud is untenable if the underlying claim of fraud fails. Rezem Fam. Assocs. v. Borough of Millstone, 423 N.J. Super. 103, 122 (App. Div. 2011) (quoting Banco,184 N.J. at 177-78).

Here, there is no evidence that CHM or Marroquin committed fraud in relation to the instant transaction. They were not involved in the deal and did not receive any portion of the deposit. As stated above, however, there are material disputed facts as to whether DCE I, Matsamy, Tanya, PBA, and Tietjen intentionally made material misrepresentations or omissions. There is also evidence that these parties acted in concert and split the deposit amongst themselves.

We also find there is a genuine factual issue as to whether SRST and Daugherty participated in this alleged fraud. Plaintiffs have presented evidence that SRST and Daugherty represented Marroquin and Matsamy during the 2015 Green Lago litigation and thus knew about the $542,250 judgment entered against Marroquin. As stated above, this judgment may have affected the marketability of the Union store and its assets. Plaintiffs contend SRST and Daugherty did not disclose the judgment or provide information regarding the litigation when requested to do so. Plaintiffs contend that in a series of emails,

Daugherty insisted that there were "no open issues" or "liens or encumbrances" affecting marketability, and repeatedly pressured plaintiffs to close on transaction. There are genuine issues of material fact in dispute with respect to these claims that preclude summary judgment.

Aiding and Abetting Fraud

Plaintiffs asserted an aiding and abetting fraud claim against all defendants. The trial court dismissed this claim as to AGC 2, AGC 3, and DCS. To prove that a defendant was aiding and abetting fraud, the following elements must be met:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.
>
> [State, Dep't of Treasury ex rel. McCormac v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 483-84 (App. Div. 2006) (quoting Tarr v. Ciasulli, 181 N.J. 70, 84 (2004)).]

For the same reasons given for civil conspiracy to commit fraud, the aiding and abetting fraud claim was properly dismissed as to CHM and Marroquin, but should not have dismissed as to DCE I, Matsamy, Tanya, PBA, Tietjen, SRST, and Daugherty.

33

RICO

Lastly, plaintiffs asserted RICO claims against all defendants. The trial court initially dismissed the RICO claims as to AGC 2, AGC 3, and DCS.

"The RICO Act, generally, makes it a crime for a person to be employed by or associated with 'an enterprise' and to engage or participate or become involved in the business of the enterprise 'through a pattern of racketeering activity.'" State v. Ball, 141 N.J. 142, 151 (1995) (quoting N.J.S.A. 2C:41-2(b) and 2(c)). "The Act also makes it a crime for a person to conspire to engage in such conduct." Ibid. (citing N.J.S.A. 2C:41-2(d)).

"Racketeering activity" includes "fraudulent practices." Mayo, Lynch & Assocs., Inc. v. Pollack, 351 N.J. Super. 486, 495 (App. Div. 2002) (citing N.J.S.A. 2C:41-1(a)(1)(o)). "A 'pattern of racketeering activity' requires '[e]ngaging in at least two incidents of racketeering conduct' that 'embrace criminal conduct' and are interrelated." Ibid. (quoting N.J.S.A. 2C:41-1(d)(1) and (2)). "Under [RICO] an 'enterprise' includes 'any . . . group of individuals associated in fact although not a legal entity . . . .'" Ibid. (quoting N.J.S.A. 2C:41-1(c)).

The RICO Act establishes both criminal penalties, N.J.S.A. 2C:41-3, and civil remedies, N.J.S.A. 2C:41-4, for conduct that violates N.J.S.A. 2C:41-2.

"Any person damaged in his business or property by reason of a violation of N.J.S.A. 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of suit, including a reasonable attorney's fee, cost of investigation and litigation." N.J.S.A. 2C:41-4(c).

"In order to establish standing to institute a civil action under RICO, it must be shown that 'plaintiff's harm was proximately caused by the RICO predicate acts alleged, i.e., that there was a direct relationship between plaintiff's injury and defendant's conduct." Interchange State Bank v. Veglia, 286 N.J. Super. 164, 178 (App. Div. 1995) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)). "This requires a showing not only that the defendant's alleged RICO violation was the 'but for' cause or cause-in-fact of his injury, but also that the violation was the legal or proximate cause." Ibid. (citing Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 265 (1992)). "If a plaintiff is harmed only in an indirect way by the predicate acts, the plaintiff does not have standing to pursue a RICO claim." Id. at 180 (citing Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 828 F. Supp. 287, 296 (D.N.J. 1993)); accord Franklin Med. Assocs. v. Newark Pub. Sch., 362 N.J. Super. 494, 514-15 (App. Div. 2003). In Veglia, we noted "[t]he 'general rule in fraud cases . . . is that you are liable only to an intended victim." 286 N.J. Super. at 182 (quoting

35

In re EDC, 930 F.2d 1275, 1279 (7th Cir. 1991)). "The victim need not be the primary victim, only an intended victim." Ibid. (citing EDC, 930 F.2d at 1279).

Plaintiffs allege at least two fraudulent actions. First, they allege the 2015 transfer from CHM and Marroquin to DCE I, Matsamy, and Tanya was fraudulent because the purpose of the transaction was to avoid paying the Green Lago judgment. Plaintiffs also assert that the instant transaction was fraudulent. We conclude there is a genuine issue of material fact as to whether these transactions were fraudulent, however, not all the defendants were involved in both transactions.

CHM and Marroquin were involved in the 2015 transfer only. And, while SRST and Daugherty represented certain defendants during the 2017 Green Lago litigation, there is no evidence that SRST and Daugherty facilitated the 2015 transfer. As a result, these defendants did not engage in a "pattern of racketeering." Additionally, plaintiffs were not the intended victims of the 2015 fraudulent conveyance. Therefore, plaintiffs do not have standing to pursue a RICO claim against CHM, Marroquin, SRST, and Daugherty. Accordingly, the RICO claims against CHM, Marroquin, SRST, and Daugherty were properly dismissed.

We reach a similar conclusion as to DCE I, Matsamy, Tanya, PBA, and Tietjen, even though they were involved in both transactions.[5]  If proven at trial, the evidence supports "two incidents" of "fraudulent practices" among a "group of individuals."  Again, however, plaintiffs were not the intended victims of the 2015 fraudulent conveyance.  Nor were plaintiffs the intended victims of the other events that preceded the 2018 OTP that affected marketability of title.  Therefore, plaintiffs do not have standing to pursue RICO claims against DCE I, Matsamy, Tanya, PBA, and Tietjen.  Accordingly, the RICO claims against DCE I, Matsamy, Tanya, PBA, and Tietjen were properly dismissed.

III.

We summarize our rulings as follows.  We affirm the dismissal of the breach of contract claims against PBA and Tietjen and reverse the dismissal of the breach of contract claims against DCE I, Matsamy, and Tanya.

We reverse the dismissal of the breach of escrow and conversion claims against PBA and Tietjen.

---

[5]  During her deposition in the Green Lago litigation, Tietjen admitted "involvement" in the 2015 transfer.  While there may be a disputed material fact as to whether her involvement was fraudulent, this does not end our analysis.

We affirm the dismissal of the civil conspiracy to commit fraud claims against CHM and Marroquin and reverse the dismissal of those claims against DCE I, Matsamy, Tanya, PBA, Tietjen, SRST, and Daugherty.

We affirm the dismissal of the aiding and abetting claims against CHM and Marroquin and reverse the dismissal of those claims against DCE I, Matsamy, Tanya, PBA, Tietjen, SRST, and Daugherty.

We affirm the dismissal of unjust enrichment claims against CHM, Marroquin, SRST, Daugherty, AGC 2, AGC 3, and DCS, and reverse the dismissal of those claims against DCE I, Matsamy, Tanya, PBA, and Tietjen.

We affirm the dismissal of the constructive trust claims against CHM, Marroquin, SRST, Daugherty, AGC 2, AGC 3, and DCS, and reverse the dismissal of those claims against DCE I, Matsamy, Tanya, PBA, and Tietjen. On remand, we direct the trial judge to consider whether a constructive trust should be imposed against DCE I, Matsamy, Tanya, PBA, and Tietjen.

We affirm the dismissal of the RICO claims against CHM, Marroquin, DCE I, Matsamy, Tanya, PBA, Tietjen, SRST, and Daugherty.

In so ruling, we express no opinion as to the ultimate merit of plaintiffs' remaining causes of action. That determination will be made by the factfinder.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion and trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3169-20